Argued and submitted October 29, 2008, decision of Court of Appeals affirmed in part and reversed in part; revisions to management plan upheld in part and invalidated in part, and case remanded to Columbia River Gorge Commission for further proceedings July 16, 2009

FRIENDS OF THE COLUMBIA GORGE, INC.,
Columbia Riverkeeper, Columbia Gorge Hotel Co.,
1000 Friends of Oregon, Claudia Curran,
Eric Lichtenthaler, Jack Mills, Kate Mills,
Phil Pizanelli, Dixie Stevens, Brian Winter,
and Cynthia Winter,
*Petitioners on Review,*

*v.*

COLUMBIA RIVER GORGE COMMISSION,
*Respondent on Review.*

(CA A125031; SC S055722)

213 P3d 1164

Gary K. Kahn, of Reeves, Kahn & Hennessy, Portland, argued the cause and filed the briefs for petitioners on review Friends of the Columbia Gorge, Inc., Columbia Riverkeeper, Columbia Gorge Hotel Co., Claudia Curran, Eric Lichtenthaler, Jack Mills, Kate Mills, Phil Pizanelli, Dixie Stevens,

Brian Winter, and Cynthia Winter. With him on the briefs was Mary Kyle McCurdy, Portland, for petitioner on review 1000 Friends of Oregon.

Jeffrey B. Litwak, White Salmon, Washington, argued the cause and filed the brief for respondent on review.

James E. Mountain, Jr., of Harrang Long Gary Rudnick P. C., Portland, filed the brief for *amicus curiae* Pacific States Marine Fisheries Commission. With him on the brief was Jona J. Maukonen, Portland. Also on the brief was John Shurts, Portland, for *amicus curiae* NW Power and Conservation Council.

Erin C. Lagesen, Assistant Attorney General, Salem, filed the brief for *amicus curiae* State of Oregon. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

GILLETTE, J.

## GILLETTE, J.

Petitioners, who are individuals, businesses and conservation organizations with connections to the Columbia River Gorge, sought judicial review by the Court of Appeals of the Columbia River Gorge Commission's (commission) 2004 revision of its management plan for the Columbia River Gorge National Scenic Area. Before that court, petitioners argued, in numerous assignments and subassignments of error, that various aspects of the 2004 revision violated the Columbia River Gorge National Scenic Area Act, 16 USC §§ 544-544p. The Court of Appeals rejected all but one of petitioners' subassignments of error. *Friends of Columbia Gorge v. Columbia River Gorge*, 215 Or App 557, 171 P3d 942 (2007). We allowed petitioners' petition for review, which challenges the various standards of review that the Court of Appeals employed in considering petitioners' claims, as well as a number of the Court of Appeals' substantive holdings. For the reasons that follow, we affirm the Court of Appeals decision in part, reverse it in part, and remand the case to the commission for further proceedings.

Because a general understanding of the Act and its relationship to the commission and the management plan is necessary to an understanding of the issues in this case, we provide the following background. In 1986, Congress passed the Columbia River Gorge National Scenic Area Act, Pub L 99-663, §§ 2-18, 100 Stat 4274 (1986), now codified at 16 USC §§ 544-544p (Scenic Area Act or Act). The Act states two purposes: (1) to create a national scenic area in Washington and Oregon "to protect and provide for the enhancement of the scenic, cultural, recreational, and natural resources of the Columbia River Gorge"; and (2) to protect and support the economy of the area "by encouraging growth to occur in existing urban areas and by allowing future economic development in a manner that is consistent with" the first purpose. 16 USC § 544a. The Act creates the Columbia River Gorge National Scenic Area, § 544b, a designated area of land that lies adjacent to the Columbia River in Oregon and Washington. It also authorizes those two states to enter into an interstate compact and to create a regional commission, which, in cooperation and consultation with the United States Secretary of Agriculture (the secretary), is charged with

developing, implementing, and administering a management plan for the scenic area. 16 USC §§ 544c, 544d.

The Act itself establishes a framework and a process for developing the contemplated management plan. First, it divides the land in the scenic area into three categories: (1) "Special Management Areas" (SMAs), over which the Secretary of Agriculture is to have primary responsibility; (2) "Urban Areas," which the Act largely exempts from the commission's control; and (3) all remaining areas, which would come to be known as the "General Management Area" (GMA). 16 USC §§ 544b(b), (e). Next, the Act directs the commission to carry out various studies and inventories of the features, uses, and resources of all land within the scenic area. 16 USC § 544d(a). It then requires the commission to use the resulting studies and inventories to designate areas within the scenic area that are suitable for specified uses— agriculture, forest production, open space, and commercial and residential development. 16 USC § 544d(b). Finally, it instructs the commission to produce a land use management plan that incorporates those land use designations, is consistent with certain specified standards (set out below), and provides specific guidelines for the adoption of land use ordinances within the scenic area.[1] 16 USC § 544d(c).

The aforementioned "standards" essentially amount to a requirement that the management plan include certain protective provisions. In particular,

"[t]he management plan and all land use ordinances and interim guidelines adopted pursuant to [the Act] shall include provisions to:

"(1) protect and enhance agricultural lands for agricultural uses and to allow, but not require, conversion of agricultural lands to open space, recreation development or forest lands;

"(2) protect and enhance forest lands for forest uses and to allow, but not require, conversion of forest lands to agricultural lands, recreation development or open spaces;

---

[1] The secretary is charged with developing guidelines and designations, using a similar process, for the SMA. 16 USC § 544f.

"(3) protect and enhance open spaces;

"(4) protect and enhance public and private recreation resources and educational and interpretive facilities and opportunities, in accordance with the recreation assessment adopted pursuant to subsection (a) of this section;

"(5) prohibit major development actions in special management areas, except for partitions or short plats which the Secretary determines are desirable to facilitate land acquisitions pursuant to [this Act];

"(6) prohibit industrial development in the scenic area outside urban areas;

"(7) require that commercial development outside urban areas take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area;

"(8) require that residential development outside urban areas take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area; and

"(9) require that exploration, development and production of mineral resources, and the reclamation of lands thereafter, take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area."

*Id.* at § 544d(d).

The commission is required to consult with federal, state, and local governments in developing the management plan and must conduct public hearings and solicit public comment before finally adopting it. *Id.* at § 544d(e). Once the commission adopts a management plan, it must submit it to the secretary for review and concurrence. *Id.* at § 544d(f). Once that concurrence has been obtained (or the commission has overridden any objections by the secretary by a two-thirds vote), each of the six counties within the scenic area (three in Oregon, three in Washington) must adopt land use ordinances that are consistent with the management plan. *Id.* at § 544e.

The management plan is subject to periodic review and revision. Under section 544d(g), the commission is required to review the management plan at least every ten years "to determine whether it should be revised." As with the original management plan, it is required to submit "any revised management plan to the Secretary for review and concurrence." *Id.*

Pursuant to the Act, Oregon and Washington adopted the Columbia River Gorge Compact, which established the Columbia River Gorge Commission and provided for funding of that body. The legislatures of Oregon and Washington ratified the compact shortly thereafter, and the statutes reflecting that ratification appear, respectively, at ORS 196.150 and RCW 43.97.015. Commission members were appointed and the commission commenced work.[2] In 1991, the commission completed a management plan and the secretary concurred in that plan in 1992. Thereafter, the management plan controlled land management decisions within the scenic area (except in the Urban Areas).[3]

In 1997, the commission began the process of reviewing the original management plan "to determine whether it should be revised," as the Act requires. 16 USC § 544d(g). In the initial stage of that review, which took some time, the commission created a list of topics within the management plan that the commission believed required revision or, at least, further consideration. However, the commission thereafter lost much of the funding that it had depended on to carry out its review and, therefore, decided that it should confine its review to a smaller, select group of issues. Over the

---

[2] The commission consists of 13 members—one from each of the six counties with land that is within the scenic area's boundaries, who are appointed by the governing bodies of their respective counties; three from Oregon, who are appointed by the Governor of Oregon; three from Washington, who are appointed by the Governor of Washington; and one *ex officio*, nonvoting member, who is an employee of the United States Forest Service and who is appointed by the Secretary of Agriculture. 16 USC § 544c(a)(1)(C).

[3] Much of the day-to-day implementation of the management plan occurs at the county level. The Act therefore requires counties within the scenic area to adopt land use ordinances that are consistent with the management plan. 16 USC §§ 544e(b), (c).

next few years, the commission worked on revising the management plan with respect to those selected issues and, in April 2004, it adopted a revised management plan[4] that incorporated the revisions.[5]

Following the management plan's adoption, petitioners timely filed a petition for judicial review of the plan in the Oregon Court of Appeals, as authorized by ORS 196.115.[6] They argued that various aspects of the management plan violated the requirements of the Act and also argued that the commission's review process was incomplete because the Act required it to review the *entire* management plan.

As noted, the Court of Appeals remanded the management plan to the commission for reconsideration of one minor issue, but otherwise affirmed it. Petitioners sought review by this court, challenging the Court of Appeals' resolution of 11 separate issues. We consider those challenges in turn, setting out additional facts that are pertinent to the issue under consideration as to each.

---

[4] The revised management plan and the "original" management plan are distinct plans for the purposes of this opinion. However, maintaining that distinction can be confusing and, in any event, is unnecessary. In this opinion, because the object of our review is the revised management plan adopted by the commission in 2004, we refer to that version (and not to the original 1992 plan) as "the management plan" or "the plan."

The reader also should be aware that, when we refer to the "management plan" in this opinion, we are not referring to a paper document, but to the entire body of law that comprised the revised management plan in 2004. As far as we can tell, that body of law was not published in a single paper document. In 2004, the commission *did* publish a compilation of the chapters of the management plan that it had revised, but that document did not include the many chapters of the management plan that had *not* been revised, but remained in effect. The management plan also has been amended, as provided in 16 USC § 544d(h), on many occasions since 2004, and an up-to-date version, which includes all revisions and amendments that currently are in effect, is available online at http://www.gorgecommission.org. In this opinion, for obvious reasons, when we cite provisions in the management plan, we make no attempt to refer to a particular document, online or on paper, or to page numbers therein. Instead, we simply refer to part, chapter, and provision numbers.

[5] The secretary concurred in the revised management plan in August 2004.

[6] The Act provides that any person adversely affected by a final action of the commission relating to the implementation of the Act may obtain judicial review in the state courts of Oregon and Washington. 16 USC §§ 544m(b)(4), (6)(C). ORS 196.115(2)(a) provides that, in Oregon, such review shall be in the Court of Appeals.

**1. Did the Court of Appeals state and apply an erroneous standard of review insofar as it held that, to succeed on a claim that the plan violates the Act, petitioners must demonstrate that the plan cannot be applied consistently with the Act under any circumstances?**

■ Petitioners' first three challenges pertain to standards of review that the Court of Appeals applied to petitioners' claims that various aspects of the management plan violated the Act. First, petitioners argue that the Court of Appeals erred when it held that, to prevail on any of its challenges to policies and guidelines in the management plan, petitioners "must demonstrate that the plan cannot be applied consistently with the law under any circumstance." *Friends of Columbia Gorge*, 215 Or App at 568. Petitioners contend that, to the contrary, they need only show that the challenged policies and guidelines depart from or contravene a legal standard expressed or implied in the Act.

Notably, the Act itself provides no standards for reviewing actions and orders of the commission, but appears to leave such details to the courts that are authorized to perform such reviews. Federal courts generally apply the standards of review provided in the federal Administrative Procedures Act (APA), 5 USC §§ 500-706, *see, e.g., Friends of Columbia Gorge, Inc. v. Schafer*, No CV 04-1423-MO, WL 5070962 at § 4 (D Or, Nov 24, 2008) (applying 5 USC § 706(2)(A)), and Washington courts apply the standards of review set out in the Washington Administrative Procedures Act, RCW § 34.05, and common law. *See, e.g., Friends of Columbia Gorge, Inc. v. Columbia River Gorge Com'n*, 126 Wash App 363, 369-70, 108 P3d 134 (2005) (demonstrating principle). In Oregon, however, the legislature has enacted a statute, ORS 196.115, that governs judicial review of commission actions in Oregon courts. It provides that review of final actions and orders of the commission shall be conducted, initially, in the Court of Appeals, and that the court's review "shall be in accordance with" various provisions of the Oregon Administrative Procedures Act (the Oregon APA), ORS 183.310 to 183.750, pertaining to judicial review of orders in contested cases. ORS 196.115(2), (3)(a). Moreover, and in addition to *referencing* those Oregon APA contested case provisions, the statute somewhat redundantly spells out

a standard of review that is almost identical to the one that Oregon courts are required to apply under the Oregon APA to orders in contested cases:

"(c) The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, the court shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law.

"(d) The court shall remand the order to the agency if the court finds the agency's exercise of discretion to be:

"(A) Outside the range of discretion delegated to the agency by law;

"(B) Inconsistent with an agency rule, an officially stated agency position or a prior agency practice, unless the inconsistency is explained by the agency; or

"(C) Otherwise in violation of a constitutional or statutory provision.

"(e) The court shall set aside or remand the order if the court finds that the order is not supported by substantial evidence in the whole record."

ORS 196.115(3)(c) - (e).

In considering the standard of review issue in the present case, the Court of Appeals acknowledged the foregoing statutory standard, but noted that the standard is "less than a perfect fit" with petitioners' challenges, because it calls for application of the kind of review used in contested cases, while the commission's acts under review are essentially *legislative* in nature. *Friends of Columbia Gorge*, 215 Or App at 568. The court opined that petitioners' challenges amounted to a facial challenge to the lawfulness of the management plan and concluded that, to prevail on such a claim, petitioners "must demonstrate that the plan cannot be applied consistently with the law under any circumstance." *Id.* In support of *that* standard of review, the court cited *MacPherson v. DAS*, 340 Or 117, 138-39, 130 P3d 308 (2006) and *United States v. Salerno*, 481 US 739, 745, 107 S Ct 2095,

95 L Ed 2d 697 (1987), as cases setting out the test for a challenge to the facial legality of an agency created rule.

However, as petitioners correctly observe, neither *MacPherson* nor *Salerno* is authority for application of the Court of Appeals' "not-lawful-under-any-circumstances" standard. Both cases involved a claim that a *statute* was inconsistent with a *constitutional* provision—in particular, the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Although it is true that some authority in the federal courts supports applying that standard when reviewing an agency's regulations for inconsistency with its authorizing statute,[7] this court, so far as we can determine, has never applied that standard to anything other than a constitutional challenge to a statute.

Neither do we think that this is a case that justifies applying that standard of review, so foreign to the administrative law of this state, to what at bottom simply are challenges to the validity of an administrative rule. In that regard, we observe that the management plan, both in its original and its revised form, is much like a "rule," as that term is defined in the Oregon APA, *i.e.*, it is "any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency." ORS 183.310(9). Moreover, the plan was adopted and revised by the commission through a process similar to the rulemaking process prescribed in the Oregon APA at ORS 183.335. Although the commission is not a state agency that is directly subject to the Oregon APA, it is clear that petitioners' challenges to the management plan are analogous to typical "facial" challenges to the validity of a rule under the Oregon APA. In our view, judicial review should proceed accordingly.

Petitioners urge this court to conduct its review using the methodology of *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 687 P2d 785 (1984). In *Planned Parenthood*, this court set out the following standard for

---

[7] *See Sierra Club v. Bosworth*, 510 F3d 1016, 1023-24 (9th Cir 2007) (declining to apply the *Salerno* standard and discussing its inconsistent use in the federal courts).

reviewing similar "facial" challenges to the validity of an administrative rule:

> "In the proper sequence of analyzing the legality of action taken by officials under delegated authority, the first question is whether the action fell within the reach of their authority, the question which in the case of courts is described as 'jurisdiction.' If that is not an issue * * * the question is whether the action was taken by procedures prescribed by statute or regulation. Assuming that proper procedures were followed, the next question is whether the substance of the action, though within the scope of the agency's or official's general authority, *departed from a legal standard expressed or implied in the particular law being administered, or contravened some other applicable statute.*"

*Id.* at 565 (emphasis added). We agree with petitioners that the quoted *Planned Parenthood* standard is consistent with the legislatively prescribed statutory standard at ORS 196.115(3)(c) to (e) and, particularly, with subparagraphs ORS 196.115(3)(d)(A) and (C), which provide for remand to the agency if the court finds the challenged action to be "outside the range of discretion delegated to the agency by law" or "[o]therwise in violation of a constitutional or statutory provision." That standard, and not the different standard of review that the Court of Appeals utilized, is the appropriate one for petitioners' facial challenges to the lawfulness of the management plan.

## 2. Did the Court of Appeals err in holding that, when commission actions are reviewed in Oregon courts, the deferential standard of review set out in *Chevron USA v. Natural Res. Def. Council,* 467 US 837, 104 S Ct 2778, 81 L Ed 2d 694 (1984) applies?

As noted, petitioners contend that the management plan is inconsistent, in various respects, with the requirements of the Act. To assess the validity of those claims, it is necessary to determine what the Act requires. Consequently, our review of petitioner's claims generally will involve some interpretation of the Act.

In interpreting the Act, we follow the methodology that federal courts have prescribed for interpreting federal

statutes, just as we would do in interpreting any other federal statute. *Corp. of Presiding Bishop v. City of West Linn,* 338 Or 453, 463, 111 P3d 1123 (2005). In general, that means examining the text, context, and legislative history of the statute. *Id.* However, there is an additional methodological wrinkle when, as in the present case, one of the parties before the court is the agency that has been charged with implementing the statute that is to be interpreted. A long line of federal cases, beginning with *Chevron U.S.A. v. Natural Res. Def. Council,* 467 US 837, 842-44, 104 S Ct 2778, 81 L Ed 2d 694 (1984), holds that, when a federal agency has been charged by Congress with implementing a federal statute, courts should defer to that agency's interpretation of the statute, treating that interpretation as controlling as long as it is reasonable. *See, e.g., Nat'l Ass'n of Homebuilders v. Defenders of Wildlife,* 551 US 644, 665-67, 127 S Ct 2518, 2534, 168 L Ed 2d 467 (2007); *Barnhardt v. Walton,* 535 US 212, 215, 122 S Ct 1265, 152 L Ed 2d 330 (2002); *Rust v. Sullivan,* 500 US 173, 184, 111 S Ct 1759, 114 L Ed 2d 233 (1991) (each stating same rule). Although that sort of deference is foreign to the administrative law of this state,[8] we are bound to apply it in our interpretation of federal statutes if the federal interpretive methodology so demands.

■ The remaining methodological question in this case, however, is whether the federal methodology *would* require deference by a federal court to the commission's interpretation of the Act, given the fact, among others, that the commission is not, strictly speaking, a *federal* agency charged *by Congress* with implementing a federal law. The Court of Appeals concluded that, although the commission is not a federal agency, *Chevron* deference to its interpretations of the Act is appropriate because the commission is "a creation of federal law," it is authorized to implement federal law, and "the usual rationales for deference to agency construction" therefore should apply to its interpretations of the Act. *Friends of Columbia Gorge,* 215 Or App at 570.[9]

---

[8] The *Chevron* doctrine has been widely criticized. *See, e.g.,* Laurence H. Tribe, I American Constitutional Law 997-1002 (3d ed 2000) (*Chevron,* in combination with relaxation of nondelegation doctrine, threatens to "cede large areas of the legal landscape to relatively unaccountable federal agencies.").

[9] The court identified, as the "usual rationales" for deferring to an agency's interpretation, the principles of "congressional delegation" and "separation of

Petitioners argue, however, that the commission is *not* a creation of federal law but, instead, is the creation of an interstate compact that Congress authorized but did not require Oregon and Washington to adopt. From that premise, petitioners argue that the commission is not the recipient of delegated authority from Congress but, instead, derives its authority from state law, insofar as Washington and Oregon chose to create the commission and to assign to it its present powers. Finally, petitioners observe that the Act expressly states that the commission "shall not be considered an agency or instrumentality of the United States for the purpose of *any* federal law," 16 USC § 544c(a)(1)(A) (emphasis added), including (they argue) the federal judicially created law relating to deference to agencies' statutory constructions.

For its part, the commission argues that, even if it is not *directly* a creature of federal law, the interstate compact that created it is more federal in nature than not, insofar as it incorporates federal law (the Act), pertains to subject matter of national interest, and required Congress's express consent. The commission concludes that *Chevron* deference therefore is appropriate. The commission also argues that applying *Chevron* deference in Oregon courts to the commission's interpretations of the Act is desirable because it "brings a degree of consistency and uniformity to the states' judicial review of commission actions involving interpretation of the federal Scenic Area Act that would not occur if the state courts use their own state law." The commission notes, in that regard, that federal and Washington state courts have applied *Chevron* to the commission's interpretations of the Act. Finally, the commission points to what it characterizes as a "solid history" in federal courts of applying *Chevron* deference to interstate compact agencies' interpretations of their own organic statutes.[10] The commission suggests that this court should follow suit.

powers" and the agency's superior expertise with respect to the subject matter. The court also concluded that the notice-and-comment procedures required by the Act demonstrated that Congress intended to require deference to the commission's interpretations. *Friends of Columbia Gorge*, 215 Or App at 570-77. We need not agree with the Court of Appeals' summary of the rationales for the *Chevron* doctrine to agree that the doctrine applies to the present case.

[10] The commission cites, among other cases, *People of California v. Tahoe Regional Planning* Agency, 766 F2d 1308, 1313 (9th Cir 1985) (applying *Chevron* deference to interstate compact agency); *Seattle Master Builders v. Pacific N.W.*

The commission's last two points are unpersuasive. First, given that *Chevron* is a mainstay in the federal courts, the fact that federal courts have applied *Chevron* deference to compact agencies' interpretations of federal statute may simply have been reflexive. In the absence of any explicit and authoritative holding that all courts should defer to compact agencies' interpretations of their (federal) organic statutes, regardless of differences between the particular compact agencies' powers, the review provisions in the statutes at issue, and the reviewing courts' ordinary practices, we are not inclined to follow the cited cases without conducting our own analysis of the question.

The commission's argument for applying *Chevron* as a means of ensuring uniformity in judicial review also is unpersuasive. Although we agree with the commission that variation in judicial review methodologies could undermine uniformity of land use standards within the scenic area, such variation appears entirely consistent with, and may even be contemplated by, the Act. We note, in that regard, that the Act specifically places jurisdiction to review appeals taken from commission actions *in the state courts of Washington and Oregon,* but does not specify any standard of review. One Washington court has responded to that circumstance by applying the standards of review set out in its own administrative procedures act when it is called upon to review a commission action,[11] while Oregon courts use a standard of review that the legislature specifically adopted for review of commission actions, now codified at ORS 196.115(3)(c) to (e). Although we acknowledge that the interpretation of statutes arguably is a different matter, the fact that the Act by omission creates a situation in which Oregon and Washington are free to apply different standards of review to commission

---

*Elec. Power,* 786 F2d 1359, 1370 (9th Cir 1986) (applying *Chevron* deference to Pacific Northwest Electric Power and Conservation Planning Council (an interstate compact agency)); and *NY State Dairy Foods v. Northeast Dairy Compact,* 26 F Supp 2d 249, 260, 265 (D Mass 1998) (applying *Chevron* deference to regional compact agency's construction of its own authorizing statute).

[11] *See, e.g., Friends of Columbia Gorge v. Columbia River,* 126 Wash App 363, 369-70, 108 P3d 134 (2005) ("The Act gives state courts jurisdiction over most disputes * * *. Absent published procedural rules, therefore, we apply the Washington Administrative Procedure Act, chapter 34.05 RCW.").

*actions* suggests that uniform treatment may not be the objective that Congress sought to achieve under the Act, as the commission suggests.

In the end, we think that the applicability of *Chevron* turns on a single question—whether the federal interpretive methodology (which, as discussed, we are bound to apply) would require it. And the answer to that question, as it turns out, is itself a function of congressional intent: The United States Supreme Court, which first announced the *Chevron* standard, has explained the standard in terms of a congressional intent or expectation—specifically, a congressional expectation, implied from the agency's "general conferred authority" and other circumstances, that the agency will "be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law." *United States v. Mead Corp.*, 533 US 218, 229, 121 S Ct 2164, 150 L Ed 2d 292 (2001); *see also Smiley v. Citibank (South Dakota), N.A.*, 517 US 735, 740-41, 116 S Ct 1730, 135 L Ed 2d 25 (1996) (Court accords deference to agencies under *Chevron* because of a presumption that Congress, "when it left ambiguity in a statute [that was] meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost by the agency [rather than the courts.]"). According to the Court, when circumstances suggest that such an intent or expectation exists,

> "a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise, but is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable."

*Mead Corp.*, 533 US at 229 (citations omitted).

It follows that, to resolve whether the commission's interpretations of the Act are entitled to *Chevron* deference, we must determine whether the commission's "generally conferred authority" or other aspects of the Act imply a congressional expectation that the commission will "speak with the force of law" when it addresses ambiguities and gaps in the

statute.[12] A strong indicator of such an expectation, according to the cases, is express congressional authorization to engage in rulemaking and adjudication with respect to the matters under review. *See, e.g., EEOC v. Arabian American Oil Co.*, 499 US 244, 257, 113 L Ed 2d 274, 111 S Ct 1227 (1991) (suggesting that no deference is warranted when agency is not authorized to promulgate rules). That inference is particularly strong when that authorization provides for formal administrative procedures designed to "foster the fairness and deliberation that should underlie a pronouncement of such force." *Mead Corp.*, 533 US at 230.

Applying the foregoing considerations to the present case, it appears that, to the extent that the management plan purports to carry out the purposes of the Act in a way that includes resolving ambiguities in or filling in gaps in the Act, the commission is entitled to *Chevron* deference. The Act clearly contains gaps that the commission is charged with filling. Indeed, Congress has directed the commission to "adopt a management plan for the scenic area," which must be based on resource inventories and land use designations that the Act requires the commission to develop, which must be "consistent with" certain specified statutory standards, 16 USC § 544d(c)(1), (2), and (3), and which, once adopted, will effectively control land use actions within the scenic area, 16 USC § 544e. That would seem to be the precise sort of delegation of authority that, according to *Mead* and similar cases, indicates a congressional expectation that the commission will "speak with the force of law" in filling the significant gaps left open by the statute. Moreover, to the extent that the Act authorizes the commission to develop and adopt a management plan (a documentary product that in every relevant sense is a rule or a compilation of rules), requires the commission to conduct public hearings and solicit public comment before adopting a final management plan, 16 USC § 544d(e), and requires the commission to adopt and follow other administrative procedures that would appear to be

---

[12] Of course, Oregon courts do not operate on the same set of assumptions about the intentions of the Oregon legislature. *See generally Springfield Education Assn. v. School Dist.*, 290 Or 217, 221-30, 621 P2d 547 (1980) (explaining how authority to construe statutes is allocated between agencies and courts depending on type of statutory term that is at issue).

designed to foster fairness and deliberation, 16 USC § 544c(b),[13] the commission stands well within the mainstream of agencies whose interpretations of their organic statutes have been deemed worthy of *Chevron* deference.

Petitioners argue that *Chevron* is a federal doctrine that applies only to agencies and instrumentalities of the United States, and that, whatever else it may be, the commission is *not* a federal agency. Petitioners note, in that regard, that the Act expressly provides that the commission "shall not be considered an agency or instrumentality of the United States for the purpose of any Federal Law." 16 USC § 544c(a)(1)(A). However, none of the federal cases that discusses and applies *Chevron* to agency actions appears to focus on the agency's status as a federal agency. Although the cases, of necessity, generally *do* pertain to federal agencies, their focus is on the nature of Congress's delegation of authority to the agency, rather than the agency's federal status.

Petitioners also argue that the commission is not a recipient of a congressional delegation of authority but, instead, derives its authority from an interstate agreement and, thus, from the two member states. Petitioners acknowledge that Congress gave *consent* for Oregon and Washington to enter into an interstate compact, but it notes that Congress did not *require* the states to do so. Petitioners contend that, under those circumstances, Oregon and Washington must be deemed to have created the commission and to be the source of its authority to develop and implement the management plan.

We disagree. The Act reveals a far greater Congressional role in the creation of the commission and the development of the management plan than petitioners' argument acknowledges. In addition to memorializing Congress's consent to an interstate compact, the Act provides for the formation of an interstate commission to administer that compact, describes

---

[13] Under 16 USC section 544c(b), the commission must adopt regulations

"relating to administrative procedure, the making of contracts, conflicts-of-interest, financial disclosure, open meetings of the Commission, advisory committees, and disclosure of information consistent with the more restrictive statutory provisions of either State."

in relatively fine detail the structure of that body and how its members will be appointed, requires the commission to adopt a management plan, describes the process that the commission must use for developing the management plan, and provides standards to which the resulting management plan must adhere.[14] In short, even if Oregon and Washington are the parties who enter into the compact, it is a compact of Congress's design. Of particular relevance here, it is Congress—not the states—that determined what powers and responsibilities would be delegated to the commission and what procedures the commission must follow in carrying out its responsibilities.

In the end, we conclude that, in 16 USC §§ 544 - 544p, Congress delegated authority to the commission that, under the federal methodology that we are bound to apply, implies a congressional expectation that the commission will "speak with the force of law" when it addresses ambiguities and gaps in the statutory scheme. The commission's interpretations of the Act therefore are entitled to the level of deference that the *Chevron* doctrine prescribes. That means that, if the Act is ambiguous with respect to some matter, the commission's construction must be upheld, unless it is unreasonable. *Chevron*, 467 US at 842-44.

### 3. Should courts defer to the commission's interpretations of the Act that are articulated for the first time on appeal?

As petitioners point out, a conclusion that the *Chevron* doctrine applies in this case on judicial review does not mean that any and every interpretation of the Act that

---

[14] The Act also provides, among other things, that the secretary will have authority over certain parts of the scenic area, 16 USC § 544f, that the Oregon Department of Transportation will develop a plan for restoring the Old Columbia River Highway, 16 USC § 544j, that designated rivers and streams will be subject to restrictions set out in section 7(a) of the Wild and Scenic Rivers Act, 16 USC § 1278(a), 16 USC § 544k, and that the secretary and commission will provide technical assistance to the six counties in the scenic area, 16 USC § 544l. The Act also authorizes the appropriation of federal funds for acquisition of land and for various specified projects and sets out procedures for enforcing the provisions of the Act and for bringing actions against the commission, the counties, and the secretary, 16 USC §§ 544m, 544n. All of those provisions are part of the interstate compact that Congress had in mind, and Oregon and Washington had no authority or permission to adopt a compact that did not contain them.

the commission might offer to this court is entitled to deference. Federal courts do not, for example, accord *Chevron* deference to *post hoc* rationalizations offered by an agency's lawyers, when the agency itself has not articulated a position on the issue. *Bowen v. Georgetown University Hospital*, 488 US 204, 212-13, 109 S Ct 468, 102 L Ed 2d 493 (1988).[15] Neither shall we. But our acceptance of that distinction in principle does not mean that we agree with petitioners that the Court of Appeals improperly deferred to various interpretations of the Act that the commission articulated in its briefs. That determination must be made on an argument-by-argument (or interpretation-by-interpretation) basis.

### 4. Does the management plan comply with the Scenic Area Act's mandate to protect scenic resources from cumulative adverse effects?

The Scenic Area Act provides, among other things, that the contemplated management plan "shall include provisions to * * * require" that commercial, residential, and mineral resource development occurring outside of urban areas "take place without *adversely affecting* the scenic, cultural, recreation, or natural resources of the scenic area." 16 USC §§ 544d(d)(7), (8), and (9) (emphasis added). For purposes of those and all other provisions of the Act, "adversely affecting" is defined as

"a reasonable likelihood of more than moderate adverse consequences for the scenic, cultural, recreation or natural resources of the scenic area, the determination of which is based on

"(1) the context of a proposed action;

---

[15] *See also Investment Co. Institute v. Camp*, 401 US 617, 626-28, 91 S Ct 1091, 28 L Ed 2d 367 (1971) (in determining whether Comptroller of the Currency authorization of banks' creation and operation of investment funds violated Glass-Steagall Act, Court would not defer to interpretation of the relevant provision offered by Comptroller's counsel, when Comptroller itself had not expressly articulated any position at the administrative level as to the meaning and impact of that provision). The United States Supreme Court has explained that distinction on the ground that " 'Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.' " *Bowen*, 488 US at 212 (quoting *Investment Co. Institute*, 401 US at 628).

"(2) the intensity of a proposed action, including the magnitude and duration of an impact and the likelihood of its occurrence;

"(3) *the relationship between a proposed action and other similar actions which are individually insignificant but which may have cumulatively significant impacts*; and

"(4) proven mitigation measures which the proponent of an action will implement as part of the proposal to reduce otherwise significant affects to an insignificant level."

16 USC § 544(a) (emphasis added).

Based on the foregoing provisions, petitioners argued to the Court of Appeals that the plan must include standards that protect the gorge's scenic resources from adverse effects, including cumulative adverse effects, caused by commercial, residential, and mineral resources development. Petitioners asserted that the management plan violates that requirement insofar as it contains "no standards, guidelines, criteria, or methodology for determining what causes cumulative adverse impacts to scenic resources, how to measure such impacts, or how they are regulated."[16]

The Court of Appeals concluded, however, that

"the Act contains no provision requiring the commission to spell out specific standards for determining, in advance, what causes adverse cumulative impacts to scenic resources. To the contrary, the Act makes quite clear that what constitutes an 'adverse effect,' of which cumulative effects are a component, is a matter determined in the context of specific applications in light of their intensity, their

---

[16] The commission's response in the Court of Appeals focused primarily on its own good intentions. It noted that, although the management plan addressed cumulative impacts in a number of ways, commission staff had reported that the plan's cumulative impacts analysis could be improved and that the commission had been determined to address the issue in the revision process. The commission explained, however, that budget constraints had prevented it from acting on that intention, but that it had developed a long-term plan for addressing the topic. It concluded that it had "not abuse[d] its discretion to make no changes to this topic."

The Court of Appeals correctly rejected that argument as unresponsive to petitioners' challenge: "Either the management plan, as revised, violates the Act or it does not. The fact that the process by which the commission arrived at the final product was a reasonable one does not alter the lawfulness—or unlawfulness, as the case may be—of the product itself." *Friends of Columbia Gorge*, 215 Or App at 578. The court then supplied its own reason for rejecting petitioners' argument— that the Act did not require the "standards" that petitioners were demanding.

relationship with other similar actions, and any mitigation measures that may be required. 16 USC § 544(a). The statute is unambiguous on that point. But even if that were not so, we would arrive at the same conclusion under the deferential standard that *Chevron* requires. The commission's reading of the Act to not require more detailed *a priori* standards for determining adverse cumulative effects is at least a reasonable construction of the statute."

*Friends of Columbia Gorge,* 215 Or App at 586.

Petitioners argue that the Court of Appeals is wrong about what the Act requires. They contend, first, that the Act "expressly requires the commission to include 'standards' in the management plan for preventing adverse effects to scenic resources, 16 USC § 544d(d), and the Act's definition of 'adversely affect' includes cumulative impacts, 16 USC § 544(a)(3)." We note, respecting this argument, that the three provisions at issue, 16 USC §§ 544d(d)(7), (8), and (9), require the commission to include "provisions" in the management plan that "require" that commercial, residential, and mineral resource development take place without adversely affecting scenic resources. The requirement that the management plan itself include such provisions is a "standard" that the management plan must meet, but nothing in the Act states that the required provisions must *themselves* take the form of "standards."

Still, we agree with petitioners that standards of *some* sort are required. The relevant provisions, 16 USC §§ 544d(d)(7), (8), and (9), direct the commission to include provisions in the management plan that "require" that development occur without causing more than "moderate" adverse effects, including adverse *cumulative* effects, to scenic resources. If those requirements are to be enforceable, implementing agencies must have some basis for determining when they have—or have not—been met. The management plan must contain provisions that by some means "require" that residential, commercial, and mineral resource development occur without causing adverse cumulative effects to scenic resources.[17]

---

[17] In that respect, we think that the Act is unambiguous and that, as such, any claim to deference under *Chevron* would be misplaced.

The commission responds that the management plan does contain such provisions. It points, first, to a guideline that provides:

> "Determination of potential visual effects and compliance with visual subordinance policies shall include consideration of the cumulative effects of proposed developments."

Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Key Viewing Areas, GMA Guidelines 3. The referenced "visual subordinance policies" appear to be summarized by a related policy,[18] which provides, in part, that,

> "[e]xcept for new production and/or development of mineral resources, new development on lands seen from key viewing areas[19] shall be visually subordinate to its landscape setting."

Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Key Viewing Areas, GMA Policies 2.[20] A related guideline similarly provides:

> "Each development shall be visually subordinate to its setting as seen from key viewing areas."

Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Key Viewing Areas, GMA Guidelines 2.

The commission also contends that the plan regulates and precludes cumulative adverse effects on scenic resources at a "landscape setting" level. It notes that the management plan describes and maps 13 different "landscape settings"[21] occurring in the scenic area and sets out various policies and guidelines that are directed at "maintaining the integrity" of each of them. For example,

---

[18] Although labeled a "policy," that statement is worded more like a directive or guideline, and would seem to have a similar legal effect.

[19] "Key viewing areas" are designated vantage points that provide "public scenic viewing opportunities"—generally, important public roads, parks, and trails. Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Key Viewing Areas, GMA Policies 1; Glossary.

[20] A structure or land use is "visually subordinate" to its setting if it "does not noticeably contrast with the surrounding landscape, as viewed from a specified vantage point." Management Plan, Glossary.

[21] "Landscape settings" are "the combination of land use, landform, and vegetation patterns that distinguish an area in appearance and character from other portions of the Scenic Area." Management Plan, Glossary. The landscape settings designated in the plan include "Pastoral," "Coniferous woodland," "Oak-pine woodland," "Grassland," "Rural residential," "Residential," "Village," "River

"[n]ew developments shall be compatible with their land-scape setting and maintain the integrity of that setting. Expansion of existing developments shall be compatible with their landscape setting and maintain the integrity of that setting to the maximum extent possible."

Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Landscape Settings, GMA Policies 1. And

"[m]aintenance of landscape settings shall be a key consid-eration in determining minimum parcel sizes for GMA land use designations."

*Id.,* GMA Policies 4.

Finally, the commission observes that the 2004 revisions include provisions calling for development and implementation of "scenic highway corridor strategies" for Interstate 84 and SR 14, the two principal highways that run through the gorge, which strategies would include design guidelines directed at protecting scenic resources along those corridors.[22] The import of those provisions and design guidelines to the present "cumulative effects" issue is unclear, but

---

bottomlands," and "Gorge walls, canyons and wildlands." For each landscape setting, the management plan provides a general description of the land uses, landforms, and vegetation that are typical, the types of recreational uses that are compatible with the setting, a recommended parcel size for new land divisions, and a set of "design guidelines" that are to be used to achieve visual subordinance for both new and expanding developments. The design guidelines pertain to the positioning and height of structures, the type of vegetation to be used for screening, etc., and are often phrased in precatory, rather than mandatory, terms. *See generally* Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Landscape Settings.

[22] The commission refers specifically to two "scenic travel corridors" policies:

"A scenic highway corridor strategy shall be developed and implemented for Interstate 84 (I-84). The SR 14 Corridor Strategy (1996) and associated documents shall continue to be implemented and updated as needed for Washington State Route 14 (SR 14)."

Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Scenic Travel Corridors, GMA Policies 1.

"The goals of the scenic corridor strategies shall include: 1) providing a framework for future highway improvements and management that meet Management Plan scenic guidelines and public transportation needs; and 2) creating design continuity for the highway corridor with the Scenic Area. Corridor strategies shall, at a minimum, include: a) design guidelines (e.g. materials, conceptual designs, etc.) for typical projects that are consistent with Management Plan scenic resources provisions and b) an interdisciplinary, interagency project planning and development process."

*Id.* at GMA Policies 2.

we assume that the commission points to them as evidence that it has developed, and will continue to develop, guidelines designed to maintain *overall* scenic conditions at a certain level along the I-84 and SR-14 corridors, thereby protecting scenic resources along those corridors from adverse cumulative effects.[23]

We are persuaded that at least some of the cited provisions "require" that commercial, residential, and mineral resource development take place without adversely affecting scenic resources. In particular, the Key Viewing Areas policies and guidelines require each new development to be "visually subordinate" to the relevant "setting" or "landscape setting" and expressly provide that the determination of visual subordinance must include an assessment of cumulative effects. When those "key viewing areas" policies and guidelines are read together, it is clear that the management plan requires implementing agencies to make such a cumulative impacts determination each time that they are presented with a development application, and to prohibit development that would adversely affect scenic resources.

Petitioners' argument reflects a basic dissatisfaction with the management plan's case-by-case approach to cumulative impacts, perhaps because petitioners believe that the responsible agencies—the counties—have not meaningfully implemented it. But that problem—if it exists—relates to how the counties apply the management plan, not to the plan's consistency with the Act. We conclude that the provisions in the management plan requiring planners to take cumulative impacts into account when determining, for each development proposal, how the visual subordinance standard can be achieved, are consistent with 16 USC §§ 544d(d)(7), (8), and (9) and 16 USC § 544(a)—that is, the plan contains provisions requiring that development in the scenic area take place without causing adverse effects, including cumulative effects, to scenic resources.

_____

[23] The commission also relies on Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Landscape Settings, GMA Policies 5. However, that policy pertains to *recreational* usage and, as such, does not appear to be relevant to the issue of the management plan's compliance with the requirement that *residential, commercial, and mineral resource* development take place without adversely affecting scenic resources. 16 USC §§ 544d(d)(7), (8), and (9).

As noted, the commission also contends that certain of the guidelines and policies in the management plan reflect a "landscape setting" approach to the requirement that development occur without causing adverse cumulative effects to scenic resources. As we discuss below in analyzing a similar question relating to adverse cumulative effects on natural resources, such a landscape-based approach *theoretically* could fulfill the statutory requirements that development occur without causing adverse cumulative effects. However, we have no occasion to consider the particulars of the commission's theory with respect to adverse cumulative effects on scenic resources, because we already have concluded that the management plan fulfills the statutory requirements at issue insofar as it requires consideration of adverse cumulative effects before development is permitted. In short, we conclude that the management plan complies with the statutory requirements at issue. The Court of Appeals correctly rejected petitioners' claim of error in that regard.

**5. Is the policy that the parties identify as "GMA Scenic Resource Policy 1" inconsistent with the Act insofar as it allows development projects that will adversely affect scenic resources to go forward?**

■ The revisions to the management plan include a scenic resources policy that provides:

> "Except for production and/or development of mineral resources and disposal sites for spoil materials from public road maintenance activities, nothing in the key viewing areas or landscape settings guidelines in this chapter shall be used as grounds to deny proposed uses otherwise authorized by the land use designation. However, the guidelines may affect the siting, location, size, and other design features of proposed developments, and compliance with them is mandatory."

Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Overall Scenic Provisions, GMA Policies 1.

Petitioners argue that that policy is inconsistent with provisions in the Act—specifically, 16 USC §§ 544d(d)(7), (8), and (9)—that require that development

take place without adversely affecting scenic resources. Petitioners contend that the policy can be read in only one way—as requiring implementing agencies to approve proposed developments that do not comply with the management plan's scenic protection guidelines and that therefore "adversely affect" scenic resources.[24]

The commission, in its brief to this court, appears to accept petitioners' assessment that the challenged policy requires agencies to approve projects that do not comply with key viewing areas and landscape setting guidelines. However, the commission argues that petitioners are wrong in assuming that a failure to meet key viewing area and landscape setting guidelines necessarily results in an adverse impact on scenic resources. The commission notes that, according to the Act, the determination of "adverse affect" requires consideration of the context of a proposed action and other factors. 16 USC § 544(a)(1). The commission concludes that the requirement that the context of a proposal be considered

"is important because if the context makes strict compliance with the key viewing areas and landscape settings guidelines impossible, then this policy allows some flexibility to permit agencies to approve the development—assuming, of course, that it does not cause an adverse effect."

We do not accept either petitioners' or the commission's explanation of the policy. Although the first sentence of the policy tells permitting agencies that they cannot use the scenic guidelines as a basis for *denying* a proposed *use*, the second sentence provides in no uncertain terms that compliance with the guidelines that control siting, design, and other conditions of use—which are designed to ensure that scenic resources are not adversely affected—"is mandatory." The

---

[24] Before the Court of Appeals, petitioners also argued that the commission's staff had *mis*interpreted the policy in a way that violated the Act, *i.e.*, as precluding *any* denial of a proposed use based on landscape settings and key viewing areas guidelines, even when the applicant refuses to take available steps to achieve compliance with those guidelines. The Court of Appeals concluded that, insofar as that argument pertained to a *possible* interpretation of the Act by the Commission, it was not ripe for review. *Friends of Columbia Gorge*, 215 Or App at 576. We agree and therefore confine our discussion to petitioners' alternative argument—that the policy can *only* be read in a way that violates the Act.

two provisions do not conflict. The second simply qualifies what would be an absolute grant of authority in the first sentence, if that sentence stood alone: Although a county cannot deny an application for an otherwise permissible use outright, the applicant must accept any conditions—even draconian ones—that are necessary to ensure that the development take place without affecting scenic resources and complies with the guidelines.[25] If the applicant does not or cannot sufficiently alter the proposal to satisfy the conditions required by the second sentence, permission to carry out the proposed activity must be denied. Petitioners' argument in that respect claims too much.

**6. Does the management plan comply with the Scenic Area Act's requirement that it protect natural resources from cumulative adverse effects?**

■ Petitioners' argument with respect to this assignment of error recalls its earlier argument that the management plan violates the Scenic Area Act's mandate to protect *scenic* resources from cumulative adverse effects. Petitioners again rely on the definition of "adversely affect" in 16 USC § 544(a) (set out above, 346 Or at 385-86 and on 16 USC §§ 544d(d)(7), (8), and (9), which call for provisions in the management plan "requir[ing]" that commercial, residential, and mineral resource development occurring outside of urban areas "take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area." They reasonably and correctly propose that the management plan must include provisions that require that development not cause more than moderate adverse effects, including adverse cumulative effects, to natural resources in the scenic area. And they argue (much as they did with respect to the plan's treatment of scenic resources) that the management plan does not include provisions of that sort.

---

[25] Notable in that regard is the fact that the management plan places no limitations on the conditions that counties may impose on proposed developments to ensure that they meet the primary scenic protection requirement of visual subordination to their setting. *See* Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Key Viewing Areas, GMA Guideline 4(B) ("Conditions may be applied to various elements of proposed developments to ensure they are visually subordinate to their setting as seen from key viewing areas, including, *but not limited to* [siting, retention of existing vegetation, etc.]").

The present inquiry differs from our previous inquiry into the management plan's handling of cumulative effects to *scenic* resources in one important respect: The chapter of the management plan devoted to protection of *natural* resources contains no policy or guideline that is equivalent to the noted key viewing areas policies and guidelines, which require that each development shall be visually subordinate to its setting, the GMA, and which explicitly require that determination of compliance with that visual subordinance policy include consideration of cumulative effects. Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Key Viewing Areas, GMA Guidelines 2, 3. As discussed, those two guidelines, in combination, satisfy, on a case-by-case basis, the statutory directive that the management plan require that development take place without causing adverse cumulative effects to scenic resources. *See* 346 Or at 390.

The commission agrees that, with regard to *natural* resources, the management plan does not require a case-by-case determination of whether a development causes any adverse cumulative effect. The commission asserts, however, as it did in the Court of Appeals, that the Act does not require it to prevent adverse cumulative effects on natural resources in any particular way and that it has chosen to confront the issue using a "landscape approach" rather than through a proposal-by-proposal examination of cumulative effects. The commission cites ten provisions in the management plan that, in its view, reflect that landscape approach. They are:

Management Plan, Part II, ch 1 (Agricultural Land), GMA Provisions, Large-Scale and Small-Scale Agriculture, GMA Policies, Land Use Policies 5C (stating that, for land designated as Agricultural Land, minimum lot sizes shall be established that are adequate to maintain agricultural operation and that "[t]ake into account the common field size for crops or livestock, adjacent uses, parcel sizes in the area, common size or economic unit for farms and ranches in the area, the existing landscape setting, wildlife habitat, scenic sensitivity, and other factors").

Management Plan, Part II, ch 2 (Forest Land), GMA Provisions, GMA Policies, Land Use Policies 7 (stating that a minimum parcel size "shall be established for the creation

of new parcels on lands designated Small Woodland, considering the common size of forest units in the area, the impact on management efficiency, the existing landscape setting, wildlife habitat, and other resource factors").

Management Plan, Part II, ch 4 (Residential Land), GMA Provisions, GMA Policies, Land Use Policies 1C (stating that, on land designated as Residential Land, minimum parcel sizes for land divisions shall be based on, among other things, protection of wildlife habitat, plant habitat, and wetlands).

Management Plan, Part II, ch 3 (Open Spaces), GMA Provisions, GMA Policies 8 ("Those wetlands with remarkable values, such as sensitive wildlife habitat or rare plant species, that are susceptible to disturbance from use and development shall be designated Open Space.").

Management Plan, Part II, ch 3 (Open Spaces), GMA Provisions, GMA Policies 9 ("Open Space designations shall be applied to those most significant and sensitive natural areas that are susceptible to disturbance from use and development.").

Management Plan, Part II, ch 3 (Open Spaces), GMA Provisions, GMA Policies 11 ("Habitat areas of animal species that are classified as endangered or threatened by federal or state endangered species acts or the Washington Wildlife Commission may be designated Open Space.").

Management Plan, Part II, ch 5 (Commercial Land), GMA Provisions, GMA Policies, Designation Policies 2 ("Areas outside Urban Areas shall be designated as Commercial where commercial use took place in the immediate past or is now taking place and would not adversely affect scenic, natural, cultural, or recreation resources.").

Management Plan, Part II, ch 6 (Recreation Designations), GMA Provisions, Public Recreation, GMA Policies 2 ("Lands shall be considered highly suitable for Public Recreation designation if they possess significant potential for providing two or more of [certain listed recreational] opportunities, are readily accessible, and lack hazards or highly sensitive resources.").

Management Plan, Part II, ch 6 (Recreation Designations), GMA Provisions, Commercial Recreation, GMA Policies 2C ("Lands may be considered highly suitable for Commercial Recreation uses if [among other things] * * * [p]otential

> development on the site would not adversely affect sensitive wildlife habitat or plants, wetlands, or aquatic or riparian areas. This may be achieved by either designing the development to avoid areas containing such resources or by applying mitigation measure that reduce effects on such resources to less than adverse levels.").

As can be seen, three of the cited provisions regulate the determination of minimum parcel sizes in various land use designations, while the remaining six provisions each set out a standard for determining whether land is suitable for a particular land use designation. The commission's explanation of how those provisions accomplish what is required (*i.e.*, that development occur without adverse cumulative effects to natural resources) consists of a single sentence:

> "These guidelines take a landscape approach to protecting against cumulative adverse impact to natural resources—through the assignment of land use designations and minimum parcel sizes—*i.e.*, pre-defining the types and amount of development appropriate to avoid cumulative adverse effect on natural resources."

Before we consider the validity of the commission's landscape approach, we focus on what the Act actually requires. Petitioners argue that, contrary to the commission's position, the Act mandates a case-by-case approach to cumulative effects. They note that the Act's definition of the term "adversely affect" is written in terms of the effects of "a proposed action," and that the determination of "adverse effect" is to be based on, among other things, "the relationship between a proposed action and other similar actions which are individually insignificant but which may have cumulatively significant impacts." 16 USC § 544(a).

We are not persuaded by petitioners' analysis. The relevant provisions in the act unambiguously focus on a result—that development will have *no adverse effect, including cumulative effects, to natural resources*—rather than on any particular method for achieving that result. *See* 16 USC §§ 544d(d)(7), (8), and (9). And because the statute is unambiguous on that point, deference to the commission's interpretation of the Act is not relevant. Although the Act may *explain* "adverse effect" in terms of the effects of individual

development proposals, that does not mean that the commission could not adopt a broad preventative approach: The commission might, for example, create a comprehensive system of landscape-based regulations limiting the amount and type of development to such a degree that adverse cumulative effects could not occur. But, if the commission chooses to proceed in that way, the relevant provisions still must fulfill the statutory mandate of *requiring* that development not cause adverse cumulative effects to natural resources. And that, we think, is the place where the commission's argument fails.

Certainly, some of the provisions that the commission points to are designed to ensure, or would have the effect of ensuring, that residential, commercial, and resource development do not adversely affect natural resources *in the particular land use designations where they apply*. The three Open Space designation provisions cited by the commission are examples. Collectively, those provisions require that land with the *most* significant and sensitive natural resources be placed in the Open Space designation. Under those provisions, there is no potential, on Open Space land, for adverse cumulative effects caused by residential, commercial, or mineral resource development. That is so because, on Open Space land, no residential, commercial, or mineral resource development is permitted *at all*.

The provisions pertaining to Commercial Recreation land designation also would seem to be designed to preclude the possibility of adverse cumulative effects on natural resources *on Commercial Recreation land*. The commercial recreation policy cited by the commission provides that land may be designated for Commercial Recreation uses only if "potential development on the site would not adversely affect sensitive wildlife habitat or plants, wetlands, or aquatic or riparian areas." That policy would not preclude cumulative adverse effects in itself, but it must be read in light of a related provision (not cited by the commission), which specifies:

"Lands may be considered highly suitable for Commercial Recreation uses if * * *

"* * * * *

"Potential development on the site *would not have cumulative adverse effects upon scenic, cultural, natural or recreation resources*, considering other development (existing or authorized in the management plan) in the Scenic Area or in the vicinity of the development."

Management Plan, Part II, ch 6 (Recreation Designations), GMA Provisions, Commercial Recreation, GMA Policies 2E.

But most of the other provisions that the commission cites do not accomplish what the cited Open Space and Commercial Recreation provisions do. For example, the minimum parcel size provisions for land designated for Agricultural or Forest use (where a significant level of residential development is permitted) merely require that wildlife habitat (a single component of the Gorge's natural resources) be "tak[en] into account" or "consider[ed]" when setting the minimum parcel size. The provisions contain no explicit or implied reference to adverse cumulative effects and, more importantly, no requirement that decision-makers select a minimum parcel size that eliminates any potential for adverse effects to natural resources.

It is true that the commission makes *some* effort to use land use designations and minimum parcel size determinations to eliminate the potential for adverse cumulative effects to natural resources. However, those efforts are incomplete. For Agricultural and Forest land and for a large portion of the land designated as Residential, there is no provision that even remotely demonstrates that the landscape-level approach will avoid or eliminate the adverse cumulative effects that the Act prohibits. It follows that the commission cannot successfully argue that, on a broad landscape level, the management plan "requires" that development occur without causing adverse cumulative effects to natural resources.

We already have noted (and the commission has acknowledged) that no provision or standard requires case-by-case analysis of the cumulative effects of commercial, residential, and mineral resource development on natural resources. Although such case-by-case review might not be necessary if the commission had adopted adequate alternatives, we are unable to discern any other provisions that

might address the adverse cumulative effect problem. We conclude that the management plan fails to *require* that residential, commercial, and mineral resource development take place without causing adverse cumulative effects to natural resources. In that respect, it violates the Act. The Court of Appeals erred in concluding otherwise.

**7. Does the management plan violate the Act insofar as it allows livestock grazing, without any review of resource impacts, on most of the land in the scenic area?**

■ Under the management plan, livestock grazing is allowed "outright," *i.e.*, without any review, on almost all land use designations. The only exceptions are Open Space land and "Agriculture - Special land." Management Plan, Part II, ch 7 (General Policies and Guidelines), Uses Allowed Outright, All Land Use Designations Except Open Space, GMA/SMA Guidelines 1A (permitting "agricultural uses" outright in all land designations except Open Space); Glossary (defining "agricultural use" to include "feeding, breeding, management and sale of livestock"). Petitioners argue that that arrangement "violates the Act's mandate to protect and enhance natural resources," because livestock grazing has a high potential for adversely affecting, *inter alia*, fish and wildlife habitat.

As the commission points out, petitioners posit a general statutory mandate to "protect and enhance natural resources" that simply does not exist. Certainly, the Act provides that the management plan must "protect and enhance *open spaces*," 16 USC § 544d(d)(3), which are defined, in part, in terms of natural resources that are present on land designated as open space, 16 USC § 544(l).[26] But those natural resources are not relevant to petitioners' argument, because, to the extent that grazing is allowed at all on Open Space land, it is subject to review for "compliance with guidelines for the protection of * * * natural * * * resources." Management Plan, Part II, ch 3 (Open Spaces), GMA

---

[26] 16 USC § 544(l) defines "open spaces" as "unimproved lands not designated as agricultural or forest lands * * * and designated as open space pursuant to section 544d of this title. Open spaces include[, among other things, fish and wildlife habitat, ecologically significant natural areas, water areas and wetlands, etc.]."

Provisions, GMA Guidelines, Review Uses—All Lands Designated Open Spaces: Gorge Walls and Canyonlands 1; Balch Lake Wetlands Area 1. The Act also provides that the management plan must protect natural resources from adverse effects *caused by commercial, residential, and mineral resource uses*, 16 USC §§ 544d(d)(7), (8), and (9), but it does not establish an equivalent requirement with respect to adverse effects caused by agricultural activities (such as grazing).

Petitioners fall back on the fact that one of the Act's stated purposes is "to establish a national scenic area to protect and provide for the enhancement of the scenic, cultural, recreational, and natural resources of the Columbia River Gorge." 16 USC § 544a(1). However, given that the Act *also* purports to support and protect the economy of the gorge, 16 USC § 544a(2), that it clearly sets a high value on agricultural uses, including grazing, as an important component of that economy, 16 USC §§ 544d(b)(2) and (d)(1), and that it sets out, in specific terms, the circumstances in which protection of natural and other resources must take precedence over economic values,[27] the broad statement of purpose at 16 USC § 544a(1) simply cannot be read as *mandating* protection of *all* natural resources in *all* circumstances and in *every* part of the scenic area.

In short, we agree with the commission that the Act does not require the management plan to protect all of the scenic areas' natural resources from adverse effects caused by agricultural uses. It follows that the commission has not violated the Act by allowing livestock grazing operations in most of the scenic area without prior review to determine how those operations will affect natural resources. The Court of Appeals did not err in rejecting that claim of error.

**8. Does the management plan violate the Act insofar as it fails to inventory and protect geologic resources and require avoidance of residential and commercial development within geological hazard areas?**

---

[27] See the list of standards for the management plan set out at 16 USC § 544d(d).

■ Petitioners observe that the management plan con-
tains no guidelines that are specifically directed at protecting
"geological resources" or avoiding "geological hazards." Peti-
tioners argue that the management plan's failure to address
those topics amounts to a violation of the Act. Petitioners
acknowledge that the Act nowhere uses the terms "geological
resources" and "geological hazard areas." They argue, how-
ever, that geological resources and hazards are "natural
resources" within the meaning of the Act and that, conse-
quently, the Act requires the management plan to inventory
and protect *geological* resources to the extent that it requires
the plan to inventory and protect *natural* resources. Petition-
ers point to several provisions of the Act as relevant to that
proposition: 16 USC § 544a(1) (purpose of Act is to "protect
and provide for the enhancement of the * * * *natural
resources* of the Columbia River Gorge"); 16 USC
§§ 544d(d)(7), (8), and (9) (management plan must include
provisions requiring that commercial, residential and min-
eral resource development "take place without adversely
affecting the * * * *natural resources* of the scenic area)
(emphasis added); 16 USC § 544d(a)(1)(A) (commission shall
complete a resource inventory documenting "all existing land
uses, *natural features and limitations*, * * *") (emphasis
added); and 16 USC § 544d(c)(1) (management plan must be
"based on the results of the resource inventory developed
pursuant to subsection (a)(1) of this section").

The Court of Appeals rejected petitioners' claim, but
it did not directly decide whether "geological resources" and
"geological hazards" were "natural resources" as that term is
used in the Act. Rather, the court appears to have assumed
that geological resources and hazards were covered by the
statutory term, and then to have concluded that nothing in
the Act required the management plan to *specifically* address
them or any other category of natural resources. The court
explained:

"Native plants are a natural resource in the scenic area, but
that does not mean that the Act requires the management
plan to include provisions specifically addressing the pro-
tection of each and every one. Likewise, fall foliage in the
scenic area is a physical characteristic, but that does not
mean that the management plan must include provisions

specifically pertaining to that phenomenon. If Congress had wanted such specifics included in the commission's management plan, all it had to do was say so."

Friends of Columbia Gorge, 215 Or App at 596.

That explanation may be correct as far as it goes, but it does not speak to the essential question. The Act provides that the management plan must include provisions *requiring* that commercial, residential, and mineral resource development take place without adversely affecting the scenic area's natural resources. 16 USC §§ 544d(d)(7), (8), and (9).[28] *If* geological resources are natural resources within the meaning of the Act, then the management plan must include provisions that will preclude adverse effects to those resources— whether or not those provisions *specifically* identify "geological resources" as their object. The management plan *could*

---

[28] We focus here on the requirements that the management plan contain provisions precluding adverse effects to natural resources. 16 USC §§ 544d(d)(7), (8), and (9). As noted above, petitioners also rely on 16 USC § 544a(1), which states that one of the purposes of the Act is "to establish a national scenic area to protect and provide for the enhancement of the * * * natural resources of the Columbia River Gorge." However, given that petitioners' claim of error focuses on supposed omissions from the management plan, the cited statement of purpose would appear to be irrelevant, because it does not purport to control the contents of the management plan.

Petitioners also rely on the Act's requirements that the commission complete a "resource inventory" documenting "natural features and limitations" and "natural resources" in the scenic area, and that it develop land use designations that are based, in part, on the results of those inventories. 16 USC § 544a(1)(A); 16 USC § 544d(b)(1). However, petitioners' citation to those provisions does not appear to add anything to their argument. The commission *has* inventoried "geological features" including, apparently, "hazards," *see* Management Plan, Introduction, Table 1, "Resource Inventories," and it also appears to have required use of information obtained in that inventory in making land use and minimum parcel size designations. *See, e.g.*, Management Plan, Part II, ch 4 (Residential Land), GMA Provisions, Land Use Policies 1A ("Minimum parcel sizes for land divisions shall be established, based upon[, among other things,] [a]voidance of hazards, includeing, but not limited to steep slopes, fire danger, and groundwater pollution."); Management Plan, Part I, ch 4 (Recreation Resources), GMA Provisions, Recreation Intensity Classes, GMA Policies 4 ("Land slope, road access, the presence of geologic or other hazards and the presence of significant or sensitive resources shall be primary considerations in determining the suitability of lands for recreation."); Management Plan, Part II, ch 3 (Open Spaces), GMA Provisions, GMA Guidelines, Gorge Wall and Canyonlands (reflecting fact that open space designation may be based on presence of gorge walls and canyons, which are obvious geological features of the scenic area).

satisfy that requirement without any specific mention of geological resources by, for example, setting out a catch-all provision directed at protecting *all* "natural resources." But the essential point is that the management plan must protect *all* "natural resources"—whatever that term may encompass.

It follows that the first order of business, in evaluating petitioners' claim, is to determine whether geological resources and hazards are in fact "natural resources" for purposes of the Act. The Act itself does not define that term, and the term is not one that has obvious parameters.[29] In fact, the term conveys the very kind of ambiguity that, according to the applicable standard of review,[30] might warrant deference to the commission's reasonable construction of the term.

And here the difficulty arises. As petitioners note, the commission *has* construed the term: The glossary to the management plan defines "natural resources" to include *"naturally occurring features including land,* water, air, plants, animals (including fish), plant and animal habitat, and scenery." That definition is sufficiently broad that, whatever "geological resources" and "geological hazards" might be, they fall within it. Petitioners therefore conclude that, because geological resources fall within the commission's *own* definition of "natural resources," the commission must include provisions to protect them in the management plan, as the Act requires.

But there is *another* definition of the term "natural resources" that appears in the management plan. The chapter of the management plan that is devoted to "Natural Resources" contains its own, narrower definition of the term: "For this chapter, natural resources mean wetlands, streams,

---

[29] The Act does not appear to mean the term in its most traditional sense of naturally occurring substances that have *economic* value. Rather, it also includes the additional sense that the naturally occurring features and materials are valued for other than economic reasons. Nevertheless, the use of the word *"resource"* (instead of, for example, "features") implies that its object is needed, useful, or valuable. *See Webster's Third New Int'l Dictionary* 1934 (unabridged ed 2002) (defining "resource" as "a new or a reserve source of supply or support: a fresh or additional stock available at need; something in reserve or ready if needed * * *. *[R]esource* may refer to any asset or means benefitting or assisting one.").

[30] *See* discussion of *Chevron* doctrine above, 346 Or at 377-84.

ponds and lakes, riparian areas, wildlife and wildlife habitat, rare plants, and natural areas."[31] Management Plan, Part I, ch 3 (Natural Resources). Given that the Natural Resources chapter is the single part of the plan that deals most directly with the mandate that is the focus of petitioners' argument (that natural resources be protected from adverse effects of commercial, residential, and mineral resource development), it is arguable that that chapter definition, and not the one that appears in the glossary, is the one that is relevant to the present analysis.

But is that definition of "natural resources"—the one that appears in the "Natural Resources" chapter itself, and which clearly does not encompass the geological resources and hazards that petitioners are concerned with—sufficiently reasonable that it can demand our deference under the *Chevron* doctrine? It could be. As we have observed, 346 Or at 403 and n 29, "natural resources" is an indefinite term that, along with its clear basis in the world of naturally occurring objects, conveys in a far more vague sense the idea that those objects must be valuable or beneficial. Thus, the narrower definition now under discussion could reflect the commission's considered determination as to which natural features of the scenic area are valuable in that sense, and its list of phenomena that qualify as "natural resources" is not inherently unreasonable. Neither would it necessarily be unreasonable that the commission had excluded a whole category—geological features—from its definition of "natural resources." The commission could rationally conclude that many "geological resources," *e.g.*, dirt *qua* dirt, are not valuable in and of themselves, and that geological features that *are* valuable for a particular reason can and should be protected as such—for example, as scenic resources or as a component of animal and plant habitat.

Our problem, however, is that we see no real evidence of a conscious commission choice either way. The management plan itself contains two competing definitions, both

---

[31] "Natural areas" are botanically significant sites identified by the Oregon and Washington Natural Heritage Programs under a contract with the commission. Management Plan, Part I, ch 3 (Natural Resources), Inventories and Key Laws and Programs, Natural Areas.

of which the commission apparently considers permissible under the Act. As our discussion of each definition indicates, we find both to be permissible under *Chevron*. But we decline to defer to the commission unless and until it takes some action that reflects a considered choice between the two definitions, or the abandonment of one of them. This case is being remanded to the commission for other reasons. We therefore also direct that the commission on remand specifically address which of the two definitions of "natural resources" it is relying on, preferably doing so in light of petitioners' express concerns respecting areas of geological hazard.

## 9. Does the management plan comply with the Scenic Area Act's requirement that it protect cultural resources from cumulative adverse effects?

■ Petitioners here raise a further issue pertaining to the management plan's treatment of cumulative adverse effects. They argue that, because the management plan does not (in their view) provide any standards or mechanism for assessing the cumulative effects of development on *cultural* resources, it does not and cannot satisfy the Act's mandates, set out at 16 USC §§ 544d(d)(7), (8), and (9), that provisions be included that require that commercial, residential, and mineral resource development take place without causing adverse cumulative effects to those resources. Petitioners again argue that, in light of the proposal-based wording of the definition of "adversely affected," those mandates must be read as requiring consideration of cumulative effects at the time each development is proposed. We reject that argument for the same reason that we rejected it in the context of petitioners' arguments about cumulative effects on natural resources:[32] The cited mandates unambiguously focus on a desired result (that development shall have no adverse effects, including adverse cumulative effects, to cultural resources), but they say nothing about how that result is to be achieved. The order in which petitioners wish to see the adverse effects analyses carried out is not mandated by the Act.

---

[32] 346 Or at 396-97.

A question remains as to whether the management plan contains other provisions that satisfy those mandates. The commission contends that a number of provisions in the management plan speak to those mandates. Specifically, the commission relies on:

Management Plan, Part I, ch 2 (Cultural Resources), GMA Provisions, GMA Policies 5 ("Cultural resource surveys, evaluations, assessments, and mitigation plans shall generally be conducted in consultation with Indian tribal governments and any person who submits written comments on a proposed use (interested person).").

Management Plan, Part I, ch 2 (Cultural Resources), GMA Provisions, GMA Policies 6 (Until a cultural resource survey of the GMA is complete, a reconnaissance survey shall be required for all proposed uses except the modification, expansion, replacement or reconstruction of existing buildings and structures and proposed uses that would involve little or no ground disturbance.).

Management Plan, Part I, ch 2 (Cultural Resources), GMA Provisions, GMA Policies 1 ("Generally, well defined geographic areas that possess large concentrations of cultural resources shall be designated Open Space.").

Management Plan, Part II, ch 4 (Residential Land), GMA Provisions, GMA Policies, Land Use policies 1C(5) ("minimum parcel sizes for land divisions shall be established, based upon," among other things, protection of "cultural resources").

Management Plan, Part II, ch 6 (Recreation Designations), GMA Provisions, Public Recreation, GMA Policies 2 (Lands shall be considered highly suitable for Public Recreation designation if they possess significant potential for providing certain listed public recreation opportunities, including enhancement of cultural resources, and lack "highly sensitive resources.").

Management Plan, Part II, ch 6 (Recreation Designations), GMA Provisions, Commercial Recreation, GMA Policies 2D ("Lands may be considered highly suitable for Commercial Recreation if," among other things, "[p]otential development on the site would not adversely affect significant cultural resources.").

The commission does not explain the import of those provisions, except to say—much as it did in response to petitioners' other "cumulative effects" arguments—that the management plan takes a "landscape approach" to protecting cultural resources from adverse cumulative impact. We assume that the commission means that the provisions pertaining to land use designations and minimum parcel sizes, which set basic limitations on the kinds and amount of development that may occur in the various parts of the scenic area, are designed to eliminate even the possibility that development will cause adverse cumulative effects to cultural resources.

Only the last four of the cited provisions appear to speak to that approach. And, as with the commission's "landscape approach" to adverse cumulative effects on natural resources, those four provisions do not appear to us to deliver what is required. In fact, collectively, the provisions regulate development on only a small part of the scenic area lands, and do not even purport to regulate some of the land where commercial and residential development is most likely to occur (lands designated for Commercial, Agricultural, and Forest uses). Moreover, at least two of the cited provisions are unsuited to the sort of landscape scale regulation that the commission proposes to use, even on the lands to which they apply: Although the cited Public Recreation policy reflects a general concern that Public Recreation land designations be made with an eye toward avoiding "highly sensitive resources," and the cited Residential Land Use policy provides that minimum parcel size on residential lands shall be "based on" protection of cultural resources, neither the policies themselves, nor any of the policies or provisions upon which they operate, actually *requires* that development on Public Recreation or Residential land be restricted to a level that will preclude any adverse cumulative effects to cultural resources.

Neither do the first two provisions cited by the commission appear to fulfill the statutory mandates. Rather, they merely require that "reconnaissance surveys" be performed for any proposed use that involves more than a minimal level of ground disturbance, to determine whether cultural resources might be affected. Such surveys could be a

useful tool for *identifying* cultural resources that need protection, but they do nothing in and of themselves to *require* that such resources not be adversely affected, either individually or cumulatively, by commercial, residential, or mineral resource development. Neither, as far as we can tell, are they connected to other provisions that would preclude such adverse cumulative effects.

In sum, the provisions that the commission has cited to this court do not support the commission's claim that the management plan precludes adverse cumulative effects to cultural resources at a landscape level: They do not appear to be directed toward *requiring* that commercial, residential, and mineral resource development not cause adverse cumulative effects to cultural resources. Neither have we been able to identify, on our own, other provisions that satisfy the statutory mandate. We conclude that, with respect to adverse cumulative effects to cultural resources, the management plan does not comply with the standards set out at 16 USC §§ 544d(d)(7), (8), and (9).

**10. To the extent that the management plan permits certain small scale fish processing operations on parcels in the scenic area that are designated as Residential, Small Woodland, and Small-Scale Agriculture, does it violate the Act's prohibition on industrial development outside of the scenic area's urban areas?**

Among the revisions to the management plan that the commission adopted in 2004 are a number of provisions that appear under the heading "Small Scale Fishing Support and Fish Processing Operations." The most significant of those provisions provides:

> "Small-scale fishing support and fish processing operations in conjunction with a family-based commercial fishing business may be allowed on parcels designated GMA Residential, GMA Small Woodland or GMA Small-Scale Agriculture, subject to the following conditions * * *."

Management Plan, Part II, ch 7 (General Policies and Guidelines), Small Scale Fishing Support and Fish Processing Operations, GMA Guidelines 1. The guideline then sets out

various limitations and conditions that apply to fishing support and fish processing use: such operations are allowed only on parcels that are contiguous with the Columbia River and that include a lawful dwelling; at least one permanent resident of the dwelling must participate in the operation; the operation may employ only residents of the dwelling and up to three outside employees; the operation must take place in a portion of the dwelling, not to exceed 25 percent of the area of the dwelling, or in an accessory building that does not exceed 2,500 square feet; and the operation shall support and process fish caught only by the residents of the dwelling and by up to three outside employees. *Id.* The guideline also describes the fishing support and fish processing activities that are allowed. Of particular relevance is section 1B of the guideline, which lists the approved fish processing activities:

"The following fish processing activities may be allowed: cleaning, gutting, heading, and icing or freezing of fish that is caught by the family-based commercial fishing business. Other fish processing activities shall not be allowed, including, but not limited to, canning, smoking, salting or brining for wholesale or retail sale."

Petitioners argue that the listed fish processing activities are industrial activities and that, by permitting them to occur on Residential, Small Woodland, and Small-Scale Agricultural land, the commission has violated the Act's requirement that the management plan "prohibit industrial development[33] in the scenic area outside urban areas." 6 USC § 544d(d)(6).[34] Petitioners rely on the definition of "industrial uses" provided by the management plan itself:

"Any use of land or water primarily involved in:

"1. Assembly or manufacture of goods or products,

"2. Processing or reprocessing of raw materials, processing of recyclable materials or agricultural products not produced within a constituent farm unit,

---

[33] The Act itself does not define the term "industrial development," as it is used in 16 USC § 544d(d)(6).

[34] The Act designates 13 cities and towns within the scenic area as "urban areas" and, by reference to a specified map, describes the boundaries of those urban areas. 16 USC § 544b(e).

"3. Storage or warehousing, handling or distribution of manufactured goods or products, raw material, agricultural products, forest products, or recyclable materials for purposes other than retail sale and service, or

"4. Production of electric power for commercial purposes."

Management Plan, Glossary. Petitioners argue that the approved fish processing activities—"cleaning, gutting, heading, and icing or freezing of fish"—are industrial uses within the meaning of that definition, because they involve processing, handling, and distribution of raw material, *i.e.*, fish. The commission responds that the fish processing activities permitted by the revision are sufficiently limited that they do not qualify as "industrial uses" as defined by the management plan and that allowing such activities on nonurban land designations does not violate the Act's requirement that "industrial development" be confined to urban areas.

 We first note that, although agencies are bound by their own rules, we afford particular deference to agencies' interpretations of those rules. Federal courts have held that a federal agency's construction of its own regulation is controlling unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 US 452, 461, 117 S Ct 905, 137 L Ed 2d 79 (1997). Oregon courts are almost as deferential to Oregon agencies' interpretations of their own rules, deferring to an agency's interpretation of its own rule if the interpretation is plausible and not inconsistent with the rule, the rule's context, or any other source of law. *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994). Under either framework, we will defer to the commission's interpretation of the management plan as long as that interpretation is plausible.

Guided by that standard, we are persuaded that the fish processing activities allowed by the revision are so restricted that the revision does not permit "industrial use," as defined by the management plan. Under the revision, the land on which the processing activities occur must include a dwelling, only residents of the dwelling and three other persons may participate in the processing activities, the processing activities may occur only on a small part of the parcel

(either in a portion of the residence or in a single accessory building), and only fish caught by the residents and up to three employees may be processed. Those restrictions limit the processing activities to such a degree that, when individuals use their land in the way described in the revision, the commission plausibly may state that their "use" of their land cannot be described as "primarily involved in" the processing of raw materials. That is all that is required in order for us to defer to the commission. The activities permitted by the fish processing revisions do not constitute "industrial uses" as defined by the management plan, and the fish processing revisions do not conflict with the Act's ban on "industrial development" outside urban areas. The Court of Appeals correctly rejected petitioners' claim of error.

**11. Does the management plan violate provisions in the Act specifying where commercial uses may occur, given that it allows large-scale commercial events on lands zoned for Agricultural, Forest, Public Recreation, and Residential uses?**

█ The 2004 revisions to the management plan set out guidelines pertaining to "commercial events," a category of uses that "include[s] weddings, receptions, parties and other small-scale gatherings that are incidental and subordinate to the primary use on a parcel." Management Plan, Part II, ch 7 (General Policies and Guidelines), Commercial Events, GMS Guidelines 1. In general, those guidelines allow commercial events on all GMA lands

> "except on lands designated Open Space or Commercial Forest, subject to compliance with the following conditions and the scenic, cultural, natural and recreation resource guidelines."

Management Plan, Part II, ch 7 (General Policies and Guidelines), Commercial Events, GMS Guidelines 2. The conditions referred to include requirements that the commercial event occur "in conjunction" with a lawful winery, tasting room, bed and breakfast, commercial use, or dwelling listed in the National Register of Historic Places, that the event involve no more than 100 guests, that the owner of the subject parcel live on the parcel and manage the use, and that

the owner conduct no more than 18 day-long events each year. *Id.*

Petitioners argue that, insofar as the "commercial event" provisions permit a use that self-evidently is a commercial use throughout most of the GMA, they are inconsistent with a provision of the Act that requires that commercial uses be confined to urban areas and areas designated by the commission as Commercial land. Petitioners cite 16 USC § 544d(b)(5), which requires the commission to

> "designate areas in the scenic area outside special management areas used or suitable for commercial development: Provided, That such designation shall encourage, but not require, commercial development to take place in urban areas and shall take into account the physical characteristics of the areas in question and their geographic proximity to transportation, commercial, and industrial facilities and other amenities."[35]

The commission responds that neither the quoted provision, nor any other provision in the Act, requires that commercial uses occur only in urban areas or on designated Commercial land. The commission contends, in fact, that the quoted provision does not *prohibit* anything, but simply requires the commission to designate some land within the scenic area as suitable for commercial development based on the land's physical characteristics and proximity to transportation and other amenities. The commission asserts that it has fulfilled that obligation by designating various lands as Commercial, Commercial Recreation, and Rural Center lands and by providing guidelines for the development of those lands. In making those designations, the commission adds, it has never made any determination that development that is permitted on other designated lands cannot be accompanied by incidental and subordinate commercial uses. To the contrary, it argues that the management plan always has

---

[35] In the Court of Appeals, petitioners also argued that the Commercial Event provisions violated 16 USC §§ 544d(d)(1) and (2), which require the commission to include provision in the management plan to, respectively, "protect and enhance agricultural lands for agricultural uses" and "protect and enhance forest lands for forest uses." Petitioners do not appear to be pursuing that argument before this court.

permitted some ancillary commercial uses—cottage indus-tries, produce stands and the like—in association with other permitted development throughout the scenic area, except on Open Space land.

This is a classic situation in which we cannot say that either proffered construction unquestionably is the one that Congress intended. Certainly, it is not beyond reason to interpret 16 USC § 544d(b)(5), as petitioners have, as *imply-ing* a legislative intention that, once the commission selects areas that are particularly suitable for commercial develop-ment, it must confine all extra-urban commercial uses to those areas. On the other hand, the commission's view of the provision is more in keeping with the provision's actual words: On its face, the provision says nothing about confining ancillary commercial uses outside of urban areas to desig-nated Commercial lands.

The best case that can be made for petitioners is that the provision is ambiguous with respect to the interpretive issue before us. And, because it is ambiguous, we must defer to the commission's interpretation, as long as it is not unrea-sonable. *Chevron*, 467 US at 842-43. We do not find it to be so: The idea that Congress did not intend to confine all inciden-tal, subordinate and, in this case, intermittent commercial uses to designated Commercial land is not inherently prob-lematic. Neither are we persuaded that any of the negative results that, according to petitioners, might arise out of the application of commission's construction are so egregious that they render that construction unreasonable. We con-clude that the Act does not, in fact, contain a requirement that all ancillary commercial activities occur within urban areas or areas designated as Commercial land. It follows that the Commercial Event provisions are not incompatible with the Act in the way that petitioners suggest. The Court of Appeals correctly rejected petitioners' claim of error.

Petitioners have persuaded us that the revised man-agement plan is in violation of the Scenic Area Act in a num-ber of respects, all of which we have identified in earlier parts of this opinion. We remand to the commission to correct those violations by removing erroneous provisions or by promulgat-ing new provisions that satisfy the Act's requirements.

The decision of the Court of Appeals is affirmed in part and reversed in part. The revisions to the management plan are upheld in part and invalidated in part, and the case is remanded to the Columbia River Gorge Commission for further proceedings.