Argued and submitted November 3, 2011, affirmed in part, reversed in part, and remanded for reconsideration February 23, 2012

# FRIENDS OF THE COLUMBIA GORGE, INC.,
*Petitioner,*

*v.*

# COLUMBIA RIVER GORGE COMMISSION,
*Respondent.*

Columbia River Gorge Commission
A146584

273 P3d 267

Gary K. Kahn argued the cause for petitioner. With him on the briefs was Reeves, Kahn, Hennessy & Elkins.

Jeffrey B. Litwak argued the cause and filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Edmonds, Senior Judge.

SERCOMBE, J.

## SERCOMBE, J.

Petitioner Friends of the Columbia Gorge, Inc., seeks judicial review of the Columbia River Gorge Commission's (commission) revision of its management plan, arguing that various changes made to the plan violate the Columbia River Gorge National Scenic Area Act (Scenic Area Act or the Act), 16 USC §§ 544 - 544p. The commission approved those changes in response to a decision of the Supreme Court, which held that several aspects of an earlier revision of the management plan violated the Act. *Friends of Columbia Gorge v. Columbia River (S055722)*, 346 Or 366, 213 P3d 1164 (2009). The court remanded the case to the commission to remove erroneous provisions or to promulgate new provisions that satisfy the Act's requirements. *Id.* at 413. Here, petitioner challenges three of the revisions adopted by the commission on remand. We affirm in part, reverse in part, and remand for reconsideration.

We begin with a brief overview of the legal context and the facts leading to this review.[1] Congress created the Columbia River Gorge National Scenic Area Act in 1986 with the purposes of (1) "establish[ing] a national scenic area to protect and provide for the enhancement of the scenic, cultural, recreational, and natural resources of the Columbia River Gorge" and (2) "protect[ing] and support[ing] the economy of the Columbia River Gorge area by encouraging growth to occur in existing urban areas and by allowing future economic development in a manner that is consistent with" the first purpose. 16 USC § 544a. The Act designated certain land along the Columbia River as the Columbia River Gorge National Scenic Area (the scenic area), 16 USC § 544b, and authorized Oregon and Washington to enter into an interstate compact to form a regional agency—the commission —which, in tandem with the Secretary of Agriculture of the United States, would manage the scenic area.[2] 16 USC § 544c. As part of its management scheme, the Act

---

[1] For a more complete discussion of the legal framework of the Act, see *Friends of Columbia Gorge*, 346 Or at 369-73.

[2] Oregon and Washington subsequently created and ratified an interstate compact establishing the commission. ORS 196.150; RCW 43.97.015.

"divides the land in the scenic area into three categories: (1) 'Special Management Areas' (SMAs), over which the Secretary of Agriculture is to have primary responsibility; (2) 'Urban Areas,' which the Act largely exempts from the commission's control; and (3) all remaining areas, which would come to be known as the 'General Management Area' (GMA). 16 USC §§ 544(b), (e)."

*Friends of Columbia Gorge,* 346 Or at 370. The Act directs the commission to conduct a resource inventory of all land within the scenic area, develop land use designations for the use of scenic area lands, and adopt a management plan that incorporates those land use designations and is consistent with certain enumerated standards. 16 USC § 544d(a) - (d). All counties within the scenic area must adopt land use ordinances that are consistent with the management plan. 16 USC § 544e.

The enumerated standards in the Act mandate that the management plan include certain protective provisions. Among other things,

"[t]he management plan * * * shall include provisions to—

"* * * * *

"(7) require that commercial development outside urban areas take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area;

"(8) require that residential development outside urban areas take place without adversely affecting the scenic, cultural, recreation, and natural resources of the scenic area; and

"(9) require that the exploration, development and production of mineral resources, and the reclamation of lands thereafter, take place without adversely affecting the scenic, cultural, recreation and natural resources of the scenic area."

16 USC § 544d(d). In turn, the Act defines "adversely affecting" as

"a reasonable likelihood of more than moderate adverse consequences for the scenic, cultural, recreation or natural

resources of the scenic area, the determination of which is based on—

"(1)   the context of a proposed action;

"(2)   the intensity of a proposed action, including the magnitude and duration of an impact and the likelihood of its occurrence;

"(3)   *the relationship between a proposed action and other similar actions which are individually insignificant but which may have cumulatively significant impacts*; and

"(4)   proven mitigation measures which the proponent of an action will implement as part of the proposal to reduce otherwise significant affects to an insignificant level[.]"

16 USC § 544(a) (emphasis added).

Pursuant to the Act's directives, the commission adopted a management plan in 1991. As part of its periodic review, *see* 16 USC § 544d(g) (requiring review of the management plan at least every 10 years and authorizing the commission to make revisions), the commission adopted revisions to the plan in 2004. Petitioner, among others, then sought judicial review of the revised management plan, arguing that various aspects of the plan violated the Act. As relevant to this review, the petitioners argued that (1) the management plan failed to comply with the Scenic Area Act's requirement that it include provisions protecting natural resources because the plan contained no protective guidelines for geologic resources, and geologic resources were "natural resources" within the meaning of the Act; and (2) the management plan failed to comply with the Scenic Area Act's requirement that it protect (a) scenic resources, (b) natural resources, and (c) cultural resources from "cumulative adverse effects."

Ultimately, the Supreme Court granted review and rendered a decision remanding the case to the commission to make further changes to the plan consistently with its decision. *Friends of Columbia Gorge*, 346 Or 366. The subject of this review, as framed by the parties' arguments, is whether the commission complied with the Supreme Court's directives on remand. Consequently, we recount parts of the court's decision in some detail.

In addressing the petitioners' argument that the plan failed to protect geologic—and therefore natural—resources in violation of the Scenic Area Act, the court agreed that the Act did, in fact, require protection of "natural resources," whatever that term may mean:

> "The Act provides that the management plan must include provisions *requiring* that commercial, residential, and mineral resource development take place without adversely affecting the scenic area's natural resources. 16 USC §§ 544d(d)(7), (8), and (9). *If* geological resources are natural resources within the meaning of the Act, then the management plan must include provisions that will preclude adverse effects to those resources—whether or not those provisions *specifically* identify 'geologic resources' as their object."

*Id.* at 402 (footnote omitted; emphases in original). It further explained, however, that the Act itself does not define "natural resources" and that the term is ambiguous. In light of that ambiguity, the court opined that, under *Chevron USA v. Natural Res. Def. Council*, 467 US 837, 104 S Ct 2778, 81 L Ed 2d 694 (1984), the commission's reasonable interpretation of the term would be entitled to deference. *See Friends of Columbia Gorge*, 346 Or at 377-84, 403-05 (discussing the application of *Chevron* deference to the commission's interpretations of the Scenic Area Act).

Nonetheless, the court observed that the management plan contained two conflicting definitions of "natural resources"—a broadly worded glossary definition, which would encompass geologic resources, and a more narrow definition of the term contained in the "Natural Resources" chapter of the management plan, which would not encompass geologic resources.[3] *Id.* at 403-04. The court then considered whether the more narrow definition was sufficiently reasonable to warrant deferential treatment:

---

[3] The glossary of the management plan defined "natural resources" as "[n]aturally occurring features including land, water, air, plants, animals (including fish), plant and animal habitat, and scenery." The Natural Resources chapter of the plan, on the other hand, defined the term to mean "wetlands, streams, ponds and lakes, riparian areas, wildlife and wildlife habitat, rare plants, and natural areas." Management Plan, Part I, ch 3 (Natural Resources).

"As we have observed, * * * 'natural resources' is an indefinite term that, along with its clear basis in the world of naturally occurring objects, conveys in a far more vague sense the idea that those objects must be valuable or beneficial. Thus, the narrower definition now under discussion could reflect the commission's considered determination as to which natural features of the scenic area are valuable in that sense, and its list of phenomena that qualify as 'natural resources' is not inherently unreasonable. Neither would it necessarily be unreasonable that the commission had excluded a whole category—geological features—from its definition of 'natural resources.' The commission could rationally conclude that many 'geological resources,' *e.g.*, dirt *qua* dirt, are not valuable in and of themselves, and that geological features that *are* valuable for a particular reason can and should be protected as such—for example, as scenic resources or as a component of animal and plant habitat.

"Our problem, however, is that we see no real evidence of a conscious commission choice either way. The management plan itself contains two competing definitions, both of which the commission apparently considers permissible under the Act. As our discussion of each definition indicates, we find both to be permissible under *Chevron*. But we decline to defer to the commission unless and until it takes some action that reflects a considered choice between the two definitions, or the abandonment of one of them. * * * We therefore * * * direct that the commission on remand specifically address which of the two definitions of 'natural resources' it is relying on, preferably doing so in light of petitioners' express concerns respecting areas of geological hazard."

*Id.* at 404-05 (emphasis in original).

The court also addressed the petitioners' arguments concerning cumulative adverse effects to scenic, natural, and cultural resources. As pertinent to all three types of resources, the court noted that

"16 USC §§ 544d(7), (8), and (9), direct the commission to include provisions in the management plan that 'require' that development occur without causing more than 'moderate' adverse effects, including adverse *cumulative* effects, to scenic[, cultural, or natural] resources. If those requirements are to be enforceable, implementing agencies must

have some basis for determining when they have—or have not—been met. The management plan must contain provisions that by some means 'require' that residential, commercial, and mineral resource development occur without causing adverse cumulative effects to scenic[, cultural, or natural] resources."

*Id.* at 387 (footnote omitted; emphasis in original).

The court began its "cumulative adverse effects" inquiry by examining the management plan's provisions concerning *scenic* resources. *Id.* at 385-91. The court focused, in particular, on two of the plan's provisions that provided that "[e]ach development shall be visually subordinate to its setting as seen from key viewing areas" and that "[d]etermination of potential visual effects and compliance with visual subordinance policies shall include consideration of the cumulative effects of proposed developments." Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Key Viewing Areas, GMA Guidelines 2, 3.

Based on those provisions, the court concluded that the management plan satisfied the Act's mandate to protect scenic resources from adverse effects, including cumulative effects, caused by development:

"We are persuaded that at least some of the cited provisions 'require' that commercial, residential, and mineral resource development take place without adversely affecting scenic resources. In particular, the Key Viewing Areas policies and guidelines require each new development to be 'visually subordinate' to the relevant 'setting' * * * and expressly provide that the determination of visual subordinance must include an assessment of cumulative effects. When those 'key viewing areas' policies and guidelines are read together, it is clear that the management plan requires implementing agencies to make such a cumulative impacts determination each time that they are presented with a development application, and to prohibit development that would adversely affect scenic resources.

"* * * We conclude that the provisions in the management plan requiring planners to take cumulative impacts into account when determining, for each development proposal, how the visual subordinance standard can be achieved, are consistent with [the Act]—that is, the plan

contains provisions requiring that development in the scenic area take place without causing adverse effects, including cumulative effects, to scenic resources."

*Friends of Columbia Gorge*, 346 Or at 390.

In contrast, the court determined that the management plan did not contain provisions that adequately protected *natural* resources from the cumulative adverse effects of development. *Id.* at 393-99. That is because the "Natural Resources" chapter of the plan contained no provisions that were functionally equivalent to the guidelines in the "Scenic Resources" chapter:

"The chapter of the management plan devoted to protection of natural resources contains no policy or guideline that is equivalent to the noted key viewing areas policies and guidelines, which require that each development shall be visually subordinate to its setting, the GMA, and which explicitly require that determination of compliance with that visual subordinance policy include consideration of cumulative effects. As discussed, those two guidelines, in combination, satisfy, on a case-by-case basis, the statutory directive that the management plan require that development take place without causing adverse cumulative effects to scenic resources."

*Id.* at 394 (citation and emphasis omitted). Nor were there alternative provisions in the management plan that achieved the same result (of preventing development from adversely affecting natural resources). The commission argued that it had satisfied the Act through a "landscape approach" in which numerous provisions of the plan—mainly regulations of parcel size and land use designations—operated collectively to ensure that no adverse cumulative effects occurred. The court rejected that argument, concluding that, although such an approach could theoretically fulfill the Act's requirements, the actual provisions in the plan failed to eliminate the potential for adverse effects to natural resources on all types of land within the GMA. *Id.* at 397-98. Thus, the management plan violated the Act in that respect.

Similarly, the court concluded that the management plan did not contain provisions that required development to occur without causing cumulative adverse effects to *cultural*

resources. *Id.* at 405-08. That aspect of the plan failed for much the same reason as the portion of the plan concerning natural resources: it contained no provisions requiring a case-by-case determination of the cumulative impacts of development, and the provisions cited by the commission in support of a "landscape approach" failed to preclude the possibility that development would cause adverse cumulative effects to cultural resources. Consequently, the court remanded the case to the commission to correct those violations of the Scenic Area Act.

On remand, the commission proposed to (1) adopt the more narrow definition of natural resources, (2) add a provision to the management plan requiring consideration of cumulative adverse effects to natural resources for certain development proposals, and (3) add a provision to the plan requiring consideration of cumulative adverse effects to cultural resources for certain development proposals.[4] Specifically, commission staff recommended the following changes to the management plan:

> *"Delete the definition of 'natural resources' in the Glossary \* \* \* and replace it with language from the Introduction to the Natural Resources chapter*:
>
> "**Natural resources**: ~~Naturally occurring features including land, water, air, plants, animals (including fish), plant and animal habitat, and scenery.~~ <u>Wetlands, streams, ponds and lakes, riparian areas, wildlife and wildlife habitat, rare plants, and natural areas.</u>
>
> "\* \* \* \* \*
>
> "\* \* \* *Add new Guideline 1 to the Natural Resources chapter* \* \* \*:
>
> "\* \* \* <u>Determination of potential natural resources effects shall include consideration of cumulative effects of proposed developments within the following areas: 1) wetlands, streams, ponds, lakes, riparian areas and their buffer zones; 2) rare plants and their buffer zones; 3) sites within 1000 feet of sensitive wildlife areas and site[s]; and 4) sites within 1000 feet of rare plants.</u>
>
> "\* \* \* \* \*

---

[4] Only changes relevant to this review are discussed.

"* * * *Add new Guideline 1 to the beginning of the Cultural Resources chapter* * *:

"* * * Determination of potential effects to significant cultural resources shall include consideration of cumulative effects of proposed developments that are subject to any of the following: 1) a reconnaissance or historic survey; 2) a determination of significance; 3) an assessment of effect; or 4) a mitigation plan."

After holding public hearings and receiving public comment over the course of several months, the commission adopted the proposed revisions.

Petitioner now seeks judicial review of those revisions, advancing three assignments of error, which we address in turn. First, petitioner argues that the commission failed to make a "considered choice" when it elected to adopt the more narrow definition of "natural resources" for the management plan because, in so doing, it created internal conflicts within the plan and acted inconsistently with its prior practices.[5] Thus, in petitioner's view, the commission failed to comply with the Supreme Court's directives.

As noted, the Supreme Court found that both definitions of "natural resources" contained in the management plan were "permissible under *Chevron*" but that, until the commission chose between the two conflicting definitions, it would not defer to the commission's interpretation. *Friends of Columbia Gorge*, 346 Or at 405. On remand, the commission made a choice: it abandoned the glossary definition of "natural resources" and expressly adopted the more narrow definition of the term. As the Supreme Court has already determined, that interpretation of "natural resources" is reasonable. Thus, petitioner's arguments to the contrary are unavailing.

_____

[5] We note that petitioner does not explain what "prior practices" the commission has contradicted. Instead, it argues that certain provisions in the plan protect features of the scenic area that are now excluded from the revised definition of "natural resources." We see no reason why the plan could not protect features of the scenic area that are not included in the definition of "natural resources." *See, e.g., Friends of Columbia Gorge*, 346 Or at 404 (noting that the commission could exclude a whole category of features from the definition of "natural resources" and still protect certain components of those features through the management plan).

To the extent that petitioner argues that the commission abused its discretion in choosing between the two legally permissible definitions, *see* ORS 196.115(3)(d) (providing for review of commission's exercise of discretion), we conclude that the commission did not abuse its discretion. "A familiar but nonexclusive test for determining whether discretion has been abused is whether the decision reached was 'clearly against reason and evidence.' " *EMC Mortgage Corp. v. Davis*, 174 Or App 524, 528, 26 P3d 185 (2001) (citation omitted). Meeting minutes and staff memoranda, which the commission relied on in reaching its decision, indicate that the commission believed that the scope of the Natural Resources chapter was consistent with the more narrow definition of "natural resources," that counties had primary responsibility for geologic hazard regulation, and that additional regulation of geologic features and hazards was unnecessary. Those considerations were grounded in reason and evidence. The provisions cited by petitioner do not establish that the plan is internally inconsistent or otherwise undermine the commission's decision. Nor has petitioner identified any legal standard from which the commission has departed in adopting its definition of "natural resources." *See Friends of Columbia Gorge*, 346 Or at 377 (explaining that a facial challenge to the lawfulness of the management plan is reviewed for whether the substance of the action "departed from a legal standard expressed or implied in the particular law being administered, or contravened some other applicable statute" (citation, internal quotation marks, and emphasis omitted)).

Petitioner next argues that the commission violated the Scenic Area Act "by failing to adopt provisions in the management plan that prevent cumulative adverse effects to natural resources." Specifically, petitioner argues that the new provision adopted by the commission on remand merely requires "consideration" of cumulative effects to natural resources but does not *eliminate the potential* that those resources will be adversely affected by the cumulative impacts of development. Moreover, petitioner contends, the new provision contemplates only a review of the effects of *proposed* developments on natural resources, rather than requiring an analysis of the combined effects of past, present,

and "reasonably foreseeable" future actions. In addition, petitioner argues that the "newly adopted language would require cumulative impacts review only in narrowly defined geographic areas," namely, areas that contain "select natural resources and their buffers." According to petitioner, then, development that occurs outside those "select" areas is not subject to cumulative effects review under the revised management plan even though such development could have an impact on natural resources. Thus, petitioner concludes that the revised plan violates the Act's standards that require the plan to include provisions preventing cumulative adverse effects to natural resources.

The commission responds that the provision it adopted to address cumulative adverse impacts to natural resources "mirrors the cumulative effect provision for scenic resources that the Oregon Supreme Court concluded was permissible." The commission argues that that provision, taken together with other natural resource provisions, satisfies the Act's standards by requiring a case-by-case determination of the cumulative effects of proposed developments and prohibiting development that would adversely affect natural resources. However, the commission does not point to specific provisions within the management plan that support its argument.

At the outset, we reject petitioner's argument that the new provision improperly limits review of cumulative effects to "proposed" developments instead of requiring, for each new use, a consideration of all developments that have preceded the new use and that may foreseeably follow it. First, quite aside from the practical difficulties of speculating about what future uses will take place on a particular piece of land, there is simply no requirement that cumulative effects review include a consideration of future actions. Petitioner does not point to any provision of the Act that suggests otherwise. Second, although the new provision does not explicitly refer to the collective effects of past development actions, it does so implicitly. That is because an inquiry into the "cumulative effects" of a proposed development necessarily entails consideration of its combined effects with other actions, including past actions. *See, e.g.*, Management Plan, Glossary ("Cumulative effects [are the] combined effects of two or more

activities. * * * Cumulative effects can result from individually minor but collectively significant actions *taking place over a period of time.*" (Emphasis added.)). Thus, the revised plan is not defective in that respect.

We also reject petitioner's contention that the newly adopted provision fails to fulfill the Act's mandate because it does not require consideration of cumulative effects for every development within the GMA. The management plan generally protects the areas that include or are near to a specified natural resource. *See* Management Plan, Part I, ch 3 (Natural Resources), GMA Provisions, Wetlands, GMA Guidelines, Review Uses 1, 2; Streams, Ponds, Lakes and Riparian Areas, GMA Guidelines, Review Uses 1, 2; Wildlife Habitat, GMA Guidelines, Review Uses 1; Rare Plants, GMA Guidelines, Review Uses 1. The commission has determined, in its legislative judgment, that there is a "reasonable likelihood of more than moderate adverse consequences" to natural resources only where development is within or immediately adjacent to specified natural resource areas. 16 USC § 544(a) (defining "adversely affect"). Petitioner has not identified any reason why that judgment is improper. Thus, we need not discuss that aspect of the plan any further.

As relevant to petitioner's remaining arguments, we reiterate that the Scenic Area Act mandates that the management plan "shall include provisions" that "require" commercial, residential, and mineral resource development to "take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area." 16 USC § 544d(d)(7) - (9). In other words, the management plan must ensure that development will have no adverse effect, including adverse cumulative effects, on natural resources. *Friends of Columbia Gorge*, 346 Or at 396-97.

In *Friends of Columbia Gorge*, the Supreme Court determined that two of the management plan's provisions for scenic resources, *in combination*, fulfilled the Act's mandate. One provision provided, "Each development shall be visually subordinate to its setting as seen from key viewing areas," and the other provided, "Determination of potential visual effects and compliance with visual subordinance policies

shall include consideration of the cumulative effects of proposed developments." Management Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Key Viewing Areas, GMA Guidelines 2, 3. The first provision sets forth a substantive standard that requires each development to be visually subordinate (*i.e.*, to blend in) to its setting, and the second provision requires a consideration of cumulative effects as part of the visual subordinance determination. When read together, then, the two provisions require that each proposed development be subjected to a cumulative effects analysis, and they prohibit developments that would not be visually subordinate to their setting. The Supreme Court determined that those provisions jointly satisfied the Act's mandate to prevent cumulative adverse effects to scenic resources. *Friends of Columbia Gorge*, 346 Or at 390.

Here, the new natural resources provision of the management plan, which is intended to replicate those scenic resources provisions, provides:

> "Determination of potential natural resources effects shall include consideration of cumulative effects of proposed developments within the following areas: 1) wetlands, streams, ponds, lakes, riparian areas and their buffer zones; 2) rare plants and their buffer zones; 3) sites within 1000 feet of sensitive wildlife areas and site[s]; and 4) sites within 1000 feet of rare plants."

Management Plan, Part I, ch 3 (Natural Resources), GMA Provisions. That provision, standing alone, replicates only one of the scenic resources provisions—the provision providing that determinations of visual subordinance shall include consideration of the cumulative effects of proposed developments. However, the provision itself contains no language that *prohibits* adverse cumulative effects from taking place or ensures, through a substantive standard (like the visual subordinance policy for scenic resources), that those effects will not occur. Furthermore, the commission does not identify any other provision of the management plan that would achieve, in combination with the new provision, the required result of preventing cumulative adverse effects to natural resources. Instead, the commission relies upon the cumulative effects guidelines as satisfying the directives of the Supreme Court.

Nonetheless, our own review of the management plan reveals provisions that do comply, in part, with the Act's mandate to protect natural resources from the cumulative adverse effects of development. The portion of the natural resources chapter applicable to the GMA is divided into four sections addressing different types of natural resources: wetlands; streams, ponds, lakes, and riparian areas; wildlife habitat; and rare plants. Each of those sections contains guidelines regulating uses within resource areas and their buffer zones. Proposed uses in all of those areas are "subject to compliance with guidelines for the protection of * * * natural * * * resources and [approval criteria] in this section." Management Plan, Part I, ch 3 (Natural Resources), GMA Provisions, Wetlands, GMA Guidelines, Review Uses 1, 2; Streams, Ponds, Lakes and Riparian Areas, GMA Guidelines, Review Uses 1, 2; Wildlife Habitat, GMA Guidelines, Review Uses 1; Rare Plants, GMA Guidelines, Review Uses 1. That standard of compliance with guidelines for the protection of natural resources "in this section" refers, among other things, to the new provision on cumulative effects. Thus, a consideration of cumulative effects is required, on a case-by-case basis, for proposed developments within the specified resource areas.

The question remains whether the plan contains standards that prevent adverse cumulative effects to natural resources; in other words, provisions equivalent to the visual subordinance policy for scenic resources. We conclude that the plan contains provisions that prohibit adverse effects, including adverse cumulative effects, only to wildlife habitat and rare plants. *See* Management Plan, Part I, ch 3 (Natural Resources), GMA Provisions, Wildlife Habitat, GMA Policies 7 ("Proposed uses that would adversely affect sensitive wildlife areas or sites shall be prohibited."); Wildlife Habitat, GMA Guidelines, Approval Criteria for Review Uses Near Sensitive Wildlife Areas and Sites 6, 8 (requiring wildlife management plan for proposed uses that would adversely effect sensitive wildlife areas or sites); Wildlife Habitat, GMA Guidelines, Wildlife Management Plans D, E (generally prohibiting new uses within the core habitat and intensive uses in the buffer zones); Rare Plants, GMA Policies 4, 5 (prohibiting new uses within sensitive plant species buffer zones);

Rare Plants, GMA Guidelines, Approval Criteria for Review Uses Near Sensitive Plants 4 ("New uses shall be prohibited within sensitive plant species buffer zones, except for those uses that are allowed outright."). Those provisions, in combination with the new provision adopted on remand, require consideration of cumulative effects and prohibit proposed uses that would adversely affect those types of natural resources. Thus, the sections on wildlife habitat and rare plants comply with the Act.

However, we cannot discern any equivalent provisions that prevent cumulative adverse effects to the other types of natural resources (wetlands, streams, ponds, lakes, and riparian areas). Instead, the sections pertaining to those resources merely require development taking place within the resource areas to use practicable alternatives for relocating the development (should they exist) and to minimize the impacts of the development to the extent possible. *See* Management Plan, Part I, ch 3 (Natural Resources), GMA Provisions, Wetlands, GMA Guidelines; Streams, Ponds, Lakes, and Riparian Areas, GMA Guidelines. Although those provisions minimize adverse effects where it is feasible, they in no way *require* that development take place without causing adverse effects, including adverse cumulative effects, to wetlands and riparian areas, which are included in the definition of natural resources. Thus, in that respect, the plan violates the Scenic Area Act.

In its final assignment of error, petitioner contends that the new provision addressing cumulative adverse effects to cultural resources suffers from some of the same infirmities as the provision addressing cumulative effects to natural resources. In particular, it argues that the new provision limits cumulative effects review to "proposed developments" instead of requiring a cumulative effects determination for "all past, present, and reasonably foreseeable future actions."[6] Petitioner further argues that the new provision fails to fulfill the Act's mandate because it does not require land divisions to undergo a cumulative effects review. The commission responds that petitioner misconstrues the cultural resources chapter of the management plan and argues

---

[6] We reject that argument for the reasons already expressed in this opinion.

that the plan ensures that no cultural resources will be adversely affected.

The newly adopted provision addressing cumulative effects to cultural resources provides:

> "Determination of potential effects to significant cultural resources shall include consideration of cumulative effects of proposed developments that are subject to any of the following: 1) a reconnaissance or historic survey; 2) a determination of significance; 3) an assessment of effect; or 4) a mitigation plan."

Management Plan, Part I, ch 2 (Cultural Resources), GMA Provisions, Guidelines. That provision requires that, when making a determination of effects to significant cultural resources, an implementing agency consider the cumulative effects of certain proposed developments. That provision is superficially similar to the provision addressing cumulative impacts to natural resources. Nonetheless, the chapter of the management plan devoted to cultural resources differs in important respects from its natural resources counterpart.

The management plan employs a four-step process to protect cultural resources. Management Plan, Part I, ch 2 (Cultural Resources), GMA Provisions, GMA Policies 3. Under that scheme, all proposed uses that involve more than a minimal level of ground disturbance are subject to a reconnaissance survey for cultural resources. Management Plan, Part I, ch 2 (Cultural Resources), GMA Provisions, GMA Policies 6. If a proposed use may affect cultural resources, the significance of those resources must be evaluated. Management Plan, Part I, ch 2 (Cultural Resources), GMA Provisions, GMA Policies 10. In turn, if the cultural resources are determined to be significant, an assessment of effects is required. Management Plan, Part I, ch 2 (Cultural Resources), GMA Provisions, GMA Policies 12. That assessment, according to the new provision, must include consideration of cumulative effects. Finally, if a proposed use would have an adverse effect on significant cultural resources, a mitigation plan must be prepared to ensure that the proposed use will have no adverse effect on significant cultural resources. Management Plan, Part I, ch 2 (Cultural Resources), GMA Provisions, GMA Policies 13, 14. *"Uses that would adversely*

*affect significant cultural resources shall be prohibited."*
Management Plan, Part I, ch 2 (Cultural Resources), GMA
Provisions, GMA Policies 14 (emphasis added).

For the vast majority of development, that process
both requires a determination of the development's effects,
including cumulative effects, on significant cultural
resources and prohibits adverse effects from taking place.
Nonetheless, petitioner is correct that land divisions—a type
of "development" under the plan—are exempt from recon-
naissance surveys and, therefore, are not subject to cumula-
tive effects review unless cultural resources are incidentally
discovered on the land. *See* Management Plan, Part I, ch 2
(Cultural Resources), GMA Provisions, GMA Policies 6(A)
(exempting from reconnaissance surveys proposed uses that
would not disturb the ground, including land divisions).
Because land divisions do not disturb the ground, they can-
not, in and of themselves, adversely affect cultural resources.
However, the exemption for land divisions may still violate
the Act to the extent that an approval of a land division
authorizes further development on the land without separate
approval. Under those circumstances, an exemption for a
land division would also, in effect, exempt the subsequent
development on that land from a reconnaissance survey and
cumulative effects assessment. That would contravene the
Act's directive that the plan must contain provisions requir-
ing that commercial, residential, and mineral resource devel-
opment take place without causing adverse effects, including
adverse cumulative effects, to cultural resources.

We cannot tell from the face of the plan whether the
approval of a land division would have that effect. Because
we are already remanding this case to the commission to
bring the natural resources section of the plan into compli-
ance with the Act, on remand, the commission should also
clarify the import of the land division exemption in the cul-
tural resources section of the plan and bring the plan into
compliance to the extent that it violates the Act as we have
described.

In sum, the revised management plan violates the
Scenic Area Act in that it fails to include provisions that

require commercial, residential, and mineral resource development to take place without adversely affecting natural resources. We remand to the commission to correct that violation and to reconsider the provisions of the Act addressing adverse cumulative effects to cultural resources. In all other challenged respects, the plan complies with the Act.

Affirmed in part, reversed in part, and remanded for reconsideration.